Electronically Filed - Buchanan - August 29, 2018 - 08:54 AM

## EXCLUSIVE DISTRIBUTION AND LICENSE AGREEMENT

Effective _____June 27th 2014_____, 2014 ("**Effective Date**"), VetBridge Product Development Subsidiary I (NM-OMP), LLC, a to-be-formed limited liability company of the state of Missouri ("**VB-NM-OMP**" or "**Distributor**") and NewMarket Pharmaceuticals LLC, a limited liability company of the state of Delaware ("**Manufacturer**") agree ("**Agreement**") as follows:

1.       **DISTRIBUTION AND PRODUCT DEVELOPMENT**.

(a) **Exclusive Appointment of VB-NM-OMP**.  Manufacturer appoints VB-NM-OMP as the sole and exclusive authorized wholesale distributor and reseller to advertise, promote, market, distribute, supply, and sell ("**Distribute**" or "**Distribution**") Manufacturer's Products identified in Section 1(b) in the Field identified in Section 1(c) and the Territory identified in Section 2.  For the absence of doubt, Manufacturer shall sell exclusively to Distributor and shall not sell otherwise including to other distributors, veterinarians, or animal owners.  Distributor shall have the exclusive right to appoint sub-distributors to distribute Products in the Territory.

(b) **Products.**  The "**Products**" are (i) Manufacturer's products which are rapidly dissolving formulations of omeprazole, including omeprazole direct systemic introduction (DSI) compositions for use in all non-human animals including especially equine animals, (ii) revisions, alterations, or improvements to the Products, and (iii) new veterinary products developed by Manufacturer in the Field.  Exhibit A provides a listing of Products and shall be deemed to be automatically amended from time to time by Distributor, upon written notice to Manufacturer, to include revisions, alterations, line extensions or improvements to the Products, and new veterinary products developed by Manufacturer in the Field, unless such revisions, alterations, line extensions, improvements or new products are expressly excluded from the scope of the Products by either Manufacturer or VB-NM-OMP providing written notice to the other.

(c) **Field.**  The "**Field**" shall include the veterinary use of rapidly dissolving formulations of omeprazole in all non-human animals including especially horses and other equine animals.

(d) **Product Development.**  Subject to terms and conditions set forth herein including in Exhibit B, and in exchange for the benefits set forth herewith including the exclusive arrangement for both distribution and licensing, VB-NM-OMP shall provide funding for the development of the Products.  All funding resources contributed by VB-NM-OMP shall be used solely for direct expenses related to the development of the Products.  Any use of funds by Manufacturer contrary to this provision shall provide VB-NM-OMP with the right to immediate repayment from Manufacturer of all monies paid to Manufacturer by VB-NM-OMP. The funding by VB-NM-OMP may take the form of cash payments, in-kind contributions, or payments made on behalf of another party.

v20140620ForExecution

**2.      TERRITORY**.

VB-NM-OMP shall have a right to the veterinary market in the United States of America including all of its states, districts, territories, and possessions, including the District of Columbia ("**Territory**"). The parties agree to negotiate in good faith for VB-NM-OMP to have rights in other territories.

**3.      TERM**.

**Term**.  The Term of this Agreement shall commence on the Effective Date and shall continue until no later than the earlier of: (i) termination as properly exercised herein; (ii) upon a period of 90 days after a notice of default which is not cured by the party receiving notice; or (iii) a period of 30 years ("**Term**").

**4.      PRICING**.

(a) **Pricing for Products**.  During the Term, VB-NM-OMP will purchase all Products directly from Manufacturer at the prices according to Exhibit A ("**Contract Price**" for the transfer of Product from Manufacturer to the order of Distributor).  VB-NM-OMP is solely responsible for determining the price at which VB-NM-OMP sells the Products to VB-NM-OMP's customers.  Parties will mutually determine financial parameters in good faith with regard to pricing of the Products to distribution downstream of Distributor.  For use in establishing the Contract Price, Exhibit A will be supplemented with a Transfer Price Model which shall be updated from time to time.  Manufacturer will provide to Distributor a suggested pricing policy which will be mutually considered as non-binding guidance and may be updated from time to time.

(i)      As an initial baseline, the Transfer Price Model contemplates a selling price of Products from VB-NM-OMP to distribution at a projected rate of $5.00 USD per tablet. In the event that pricing to distribution is capable of exceeding the projected rate, the parties will negotiate in good faith regarding an increase in the Contract Price (i.e., the price from Manufacturer upstream of distribution).  In the event pricing to distribution falls below the projected rate by more than $0.50 per tablet, the parties will negotiate in good faith for a decrease in Contract Price from Manufacturer to VB-NM-OMP, although Manufacturer will not be required to reduce the Contract Price to a level below $1.25/tablet.  Any decrease in the pricing to distribution shall not include discounts, promotions (including free samples of Products) or other such tools which may be implemented according to the discretion of VB-NM-OMP in connection with its marketing or sales program.

(ii)      Manufacturer shall not increase the Contract Price unless upon the increase of its own reasonable direct costs of manufacturing.  In the event of such increase of Manufacturer's reasonable direct costs, Manufacturer shall have the right to increase reasonably the Contract Price accordingly.  Manufacturer shall provide documentation of such price increases and its cost increases relating to its suppliers and contract manufacturers to Distributor and Distributor's board of directors and shall provide reasonable advance notice to VB-NM-OMP of the projected increase.  Price increase will be announced in advance with VB-NM-OMP

Case 5:18-cv-06147-BCW   Document 13-1 *SEALED*   Filed 10/19/18   Page 2 of 22

Electronically Filed - Buchanan - August 29, 2018 - 08:54 AM

being advised as soon as Manufacturer has relevant information itself or from a Collaborator such as Catalent or Srini. In any event, no increase in Contract Price shall be effective prior to a period of 30 days following notice by Manufacturer to Distributor of an announcement of increase, where such period is intended to allow Distributor the opportunity to consider purchasing and forecasting decisions. VB-NM-OMP and Manufacturer will work together in good faith to increase orders when reasonably possible in advance of actual or projected price increase and to protect fixed orders from being subject to increase.

(iii)  VB-NM-OMP will maintain and provide a rolling 12 month forecast for its projected demand of orders of the Products subject to the following conditions: (i) the first 3 months will be binding and firm; (ii) the second three months will be subject to modification by no more than 10% increase or decrease in volume of Products (and may within such constraint take into account any reasonable adjustment according to a Collaborator's ability and policy regarding changes in production forecasts)t change); and (iii) the trailing 6 months shall be for guidance and planning purposes only. Upon obtaining further information such as Manufacturer's and Collaborator's reasonable and actual circumstances such as regarding scheduling and flexibility, VB-NM-OMP shall be permitted to make reasonable adjustments to this provision.

(iv)  VB-NM-OMP will order in at least minimum batch quantities. Should batch quantities exceed the quantity required for normal business terms, VB-NM-OMP will pay Contract Price on at least 35% of the quantity. For the remaining inventory, VB-NM-OMP will pay a minimum of 35% of Contract Price or 50 cents per tablet, whichever is greater, with the balance to be paid upon transfer into VB-NM-OMP working inventory.

(b) **Terms of Sale**.  All sales to VB-NM-OMP are made in accordance with this Agreement and not Manufacturer's terms of sale. The terms and conditions of a purchase and sale shall be controlled only by this Agreement and shall not be varied by the terms of purchase or sale otherwise used by Manufacturer or VB-NM-OMP or set forth on any purchase order, acknowledgement, or other documents relating to an order. This Agreement expressly limits one party's orders and the other party's acceptance of orders to the terms set forth in this Agreement, and each party expressly objects to any additional or different terms in any purchase order, invoice or other document of the other party. A party can change the terms of purchase or sale only by amending this Agreement.

(c) **Payment**.  All purchases of Products are on open account and after credit as set forth in Section 6(d)(i) are due and payable within thirty (30) days of the statement date, with a discount of 1% of the invoice amount if the payment is issued by VB-NM-OMP to Manufacturer within ten (10) days of the invoice date. If from time to time Manufacturer establishes or adjusts a credit limit for VB-NM-OMP, then Manufacturer shall promptly notify VB-NM-OMP by e-mail or fax of the credit limit and any adjustments to the credit limit. VB-NM-OMP may, at VB-NM-OMP's option, pay Manufacturer by ACH transfer to an account designated in writing by Manufacturer. The following provision is solely in connection with payment relating to purchases and accounts directly relating to distribution of Products: after notice to the other party, either party may offset any amount directly or indirectly owed for any reason to the other party with any amounts that the other party directly or indirectly owes for any reason to the first

Exclusive Distribution Agreement - 3 of 21
v20140620ForExecution

Electronically Filed - Buchanan - August 29, 2018 - 08:54 AM

party, and each party retains all other rights of offset. Interest on late payments is eighteen percent (18%) per year.

(d) **Taxes**. VB-NM-OMP and Manufacturer shall each pay its own applicable taxes. In the event the parties expand into international distribution, then tax management will be negotiated in good faith between the two parties relative to the international segment of the business.

5.      **ORDERS, SHIPPING, RISK OF LOSS, TITLE, RETURNS, AND REPORTING**.

(a) **Ordering**. VB-NM-OMP shall submit orders for Products to Manufacturer using VB-NM-OMP's standard purchase order and subject to the rolling forecast according to Exhibit A. Manufacturer shall accept and acknowledge each order to VB-NM-OMP detailing the Product quantity, shipping date, delivery location and Contract Price.

(b) **Shipping, Risk of Loss and Title**. Manufacturer shall ship the Products (i) within seven (7) calendar days of Manufacturer's receipt of VB-NM-OMP's order and (ii) directly to the VB-NM-OMP distribution center or other location that is designated on VB-NM-OMP's purchase order. Manufacturer shall not ship Products that are within twelve (12) months of the Product's expiration date at time of shipping unless expressly authorized on VB-NM-OMP's purchase order. *For orders of five hundred dollars ($500) or more, Manufacturer shall arrange for shipping and pay the cost of shipping) and Manufacturer shall comply with* VB-NM-OMP's shipping instructions and policies, and use VB-NM-OMP's shipping account. In all events, the title, risk of loss, and risk of delay of the Products shall pass from Manufacturer to VB-NM-OMP upon VB-NM-OMP's receipt of delivery at VB-NM-OMP's distribution center or other location designated in the purchase order. In the event of a delay or failure of shipment or delivery, Manufacturer shall immediately notify VB-NM-OMP.

(c) **Returns**. As VB-NM-OMP governs forecasting and ordering, VB-NM-OMP shall be responsible for all returns other than product damage, loss or defect including latent defects. With respect to product damage or loss inclusive of latent defects, prior to making the return and upon VB-NM-OMP's request, Manufacturer shall provide VB-NM-OMP with a return authorization or similar approval. Upon receipt of the return, Manufacturer shall credit VB-NM-OMP with the then current full Contract Price of the Product, and shall issue the appropriate credit memo or invoice credit or adjustment for the shipping cost. All accounting regarding a damaged, lost, or defective Product shall be completed within fifteen (15) business days of receipt of the returned Product. . The term and conditions of this Agreement supersede the Manufacturer's and VB-NM-OMP's respective return of goods policies.

(d) **Sales Reporting**. VB-NM-OMP will report to Manufacturer data regarding the sales of Manufacturer's Products according to a mutually agreed format and schedule. Sales data provided by VB-NM-OMP will be considered Confidential Information (as defined in Section 12), regardless of whether it is marked as confidential. VB-NM-OMP will have the option to report data to a third party Data Service Provider regarding the sales of Manufacturer's Products and the sales of products of other manufacturers. For such option, the Data Service Provider would contract with VB-NM-OMP to keep identifiable sales data confidential. VB-NM-OMP

will not provide to Manufacturer identifiable data regarding sales of other manufacturers and will not provide data to other reporting services.  For additional sales data, Manufacturer may contact the Data Service Provider.

**6.**     **MANUFACTURER'S OBLIGATIONS AND DUTIES**.

During the Term, Manufacturer shall:

(a) **Promotion Materials**.  Provide promotional funds to VB-NM-OMP as per the Contract Price document on a price per tablet basis set forth in this Section 6(d)(i).  (VB-NM-OMP will use the provided funds to develop the Promotion Materials at its expense, and will obtain Manufacturer's approval for use of the Promotion Materials, prior to use.  Manufacturer's approval shall not be unreasonably withheld, conditioned or delayed.)  Supply VB-NM-OMP at Manufacturer's cost with sample Products and such catalogs, circulars and other promotional and informational material regarding the Products as mutually agreed.  VB-NM-OMP may alter such materials or develop any other materials in connection with the Distribution of Products (including without limitation product brochures and sales aids), subject to Manufacturer's review and prior written approval, which shall not be unreasonably withheld, conditioned or delayed.

(b) **Training for VB-NM-OMP**.  Supply, at Manufacturer's cost and by Manufacturer representatives, educational and training programs for VB-NM-OMP's personnel at such times and locations as mutually agreed by Manufacturer and VB-NM-OMP.

(c) **Training for Customers**.  VB-NM-OMP and Manufacturer will negotiate in good faith regarding supply and cost sharing of wet lab, clinical, educational, and training programs for VB-NM-OMP's customers and other end-users of the Products at such times and locations as mutually agreed by Manufacturer and VB-NM-OMP.

(d) **Advertising**.  As mutually agreed by Manufacturer and VB-NM-OMP, support VB-NM-OMP through Manufacturer's active promotion of the Products by advertising and other promotional activities.

(i)     **Advertising credit**.  Manufacturer shall credit Distributor an amount of $0.50 per single dose tablet purchased, up to a total credit of the actual amount contributed by Distributor for funding of Product development efforts as provided in Section 1(d) and Exhibit B.  The credit shall be provided in the form of a cash rebate upon invoicing by Manufacturer to Distributor.

(e) **Insurance**.  Maintain, with a company or companies acceptable to VB-NM-OMP, commercial general liability insurance providing coverage for liability arising from Manufacturer's activities under this Agreement and product liability insurance with respect to the products sold under this Agreement, including without limitation the Products, with minimum annual limits of $5,000,000 per occurrence and $15,000,000 in the aggregate.  Manufacturer shall maintain such general liability insurance during the Term of this Agreement and for three (3) years after the termination or expiration of this Agreement.  All certificates of insurance must

be received by VB-NM-OMP no later than the Effective Date of this Agreement, and annually thereafter. VB-NM-OMP shall be listed as an additional insured on Manufacturer's insurance.

(f) **Compliance with Laws and Standards**. Operate, produce, manufacture, label, package, store, ship and distribute the Products in compliance with all applicable federal, state, local and other laws, rules and regulations and with all applicable industry standards.

(g) **Warranties and Corrective Actions**. Be solely responsible and to take all corrective actions for all activities regarding (i) Manufacturer's full or limited warranties relating to a Product sold to and by VB-NM-OMP, (ii) Product returns by a customer or other end-user, (iii) failure of a Product, and (iv) Recalls.

**7.      VB-NM-OMP'S OBLIGATIONS AND DUTIES**.

During the Term, VB-NM-OMP shall:

(a) **Efforts**. Use VB-NM-OMP's commercially reasonable efforts to Distribute the Products to customers.

(b) **Sales Force**. Maintain a sales force to represent and promote the sales of the Product, and keep the sales force informed regarding the advertising and marketing programs and policies of Manufacturer.

(c) **Customer Service**. Provide prompt and effective customer service regarding the Products.

(d) **Insurance**. Maintain commercial general liability insurance providing coverage for liability arising from VB-NM-OMP's activities under this Agreement with minimum annual limits of $1,000,000 per occurrence and $5,000,000 in the aggregate. VB-NM-OMP shall maintain such general liability insurance during the Term of this Agreement and for three (3) years after the termination or expiration of this Agreement. Upon request, VB-NM-OMP will provide Manufacturer with certificates of insurance.

(e) **Compliance with Laws and Standards**. Operate, label, package, store, ship and distribute the Products, as applicable, in compliance with all applicable federal, state, local and other laws, rules and regulations and with all applicable industry standards.

**8.      PRODUCT COMPLAINTS, CORRECTIONS AND RECALLS.**

(a) **Product Complaints**. If and when VB-NM-OMP receives notice of (i) an adverse drug experience, product defect, or manufacturing defect (as defined in 21 C.F.R. § 514.3) of the type that is reportable on FDA Form 1932a or successor form, or (ii) a lawsuit involving a product, VB-NM-OMP will forward the notice to Manufacturer. Upon completion of notice, VB-NM-OMP shall have no further obligation to Manufacturer unless Manufacturer and VB-NM-OMP mutually agree otherwise.

Electronically Filed - Buchanan - August 29, 2018 - 08:54 AM

(b) **Product Recalls**. If a recall, market withdrawal, field correction, corrective action, or similar action ("**Recall**") is implemented by Manufacturer or is required by any federal, state, local or other regulatory or governmental authority, Manufacturer shall notify VB-NM-OMP and take all actions necessary to promptly execute the Recall, including without limitation working with or through VB-NM-OMP regarding the Recall of the Products. A Recall will be conducted and directed by Manufacturer, and VB-NM-OMP shall follow Manufacturer's commercially reasonable directions. For any Recall, Manufacturer shall directly pay or reimburse VB-NM-OMP for all reasonable costs and expenses, if any, incurred by VB-NM-OMP (including without limitation shipping, notification, and the repurchase of any Recalled Products which are in VB-NM-OMP's possession). For purposes of determining the extent and nature of any Recall, Manufacturer and VB-NM-OMP shall each maintain complete and accurate records for all Products, including without limitation sales and service records. The records shall be maintained for five years or such longer period as may be required by applicable law.

9. **MANUFACTURER'S LIMITED WARRANTIES TO VB-NM-OMP**. Manufacturer represents and warrants to VB-NM-OMP that:

(a) **Warranty Benefiting VB-NM-OMP**. Manufacturer represents and warrants to VB-NM-OMP that the (i) Products will be manufactured, labeled, packaged, stored, shipped and sold to VB-NM-OPM in compliance with all applicable federal, state, local and other laws and regulations and in compliance with all applicable industry standards, (ii) Products are free and clear of any defects arising from the failure of Manufacturer to properly manufacture, label, package, store and ship the Products, (iii) Products shall be delivered free of any security interest, lien or encumbrance, (iv) Products conform to the description, grade, condition, and specifications of the Products invoiced, (v) Products are free of any defect in design, materials or workmanship, (vi) Products do not infringe on any patent, copyright, trademark or other intellectual property of a third party, (vii) Manufacturer owns or has valid licenses to use or sell programs, processes, services, patents, copyrights, trademarks, trade secrets or other proprietary rights associated with the Products, (viii) Manufacturer has authority to appoint VB-NM-OMP as an authorized Distributor of Products, (ix) to the extent Manufacturer is not the true manufacturer of all or some of any of the Products, Manufacturer is authorized by the true manufacturer to appoint VB-NM-OMP as an authorized Distributor of the Products, and (x) Manufacturer will operate in compliance with all applicable federal, state, local and other laws and regulations and in compliance with all applicable industry standards.

(b) **Warranty Benefiting End-User**. Manufacturer may issue to the veterinarian, veterinary hospital, clinic, or other third-party end-user of the Product ("**End-User**") a custom warranty with the rights and remedies as determined by Manufacturer in Manufacturer's sole discretion. If issued, such custom warranty will be appended to this Agreement in Exhibit A as Manufacturer's End-User Warranty and may be updated from time to time. If Manufacturer does not provide to the End-User the Manufacturer's own warranty, then Manufacturer provides to the End-User the full warranty provided by the Uniform Commercial Code as applicable in the End-User's jurisdiction.

Case 5:18-cv-06147-BCW    Document 13-1 *SEALED*    Filed 10/19/18    Page 7 of 22

10.    **INTELLECTUAL PROPERTY**.

(a) **Protection of Each Party's Intellectual Property**.  Each party recognizes that the other party has significant IP and goodwill associated with its IP, and that the protection and enhancement of the goodwill is critical to the other party.  To protect the IP and goodwill, during the term of this Agreement and thereafter, for the party's IP existing as of the Effective Date or identified in a written notice to the other party, a party shall not (i) use any of the other party's IP without the express written consent of the other party, (ii) claim any right, title, or interest in the other party's IP, or (iii) seek to register any of the other party's IP with any third party regulators. Each party shall comply with all reasonable requests of the other party for the protection of the other party's IP.    "**IP**" is (i) any patent application, patent, copyright or trademark, and (ii) programs, processes, services, know-how, trade secrets or other proprietary rights.

(b) **Manufacturer IP Warranties**.  To the best of its knowledge, Manufacturer has all rights in and to all IP associated with the Products that are necessary for VB-NM-OMP to Distribute and license the Products.  To the best of Manufacturer's knowledge, The Products do not infringe upon or violate any patent, copyright, trade secret, trade name, trademark or any other proprietary right of any third party.    Should a Product, any component thereof, or Manufacturer's IP become, or in Manufacturer's opinion is likely to become, the subject of an injunction or equitable relief in connection with a claim of infringement, Manufacturer shall (i) indemnify VB-NM-OMP as set forth in Section 11, and (ii) at VB-NM-OMP's election and in its sole discretion (a) procure the right for VB-NM-OMP to continue to sell the Product, (b) replace or modify the Product to make the Product non-infringing or with a non-infringing Product, provided that any such replaced or modified Product meets Manufacturer's published specifications of the Product that is modified or replaced, or (c) recall and withdraw the Product from the market and terminate this Agreement as to that Product.

(c) **Manufacturer IP License**.  To the extent applicable, Manufacturer hereby grants VB-NM-OMP, in connection with the Distribution of the Products in the Territory, an exclusive, transferable, perpetual, and royalty-free right and license to use, sell, offer for sale, import, and Distribute, with right to sub-license (i) the Manufacturer IP associated with the Products including but not limited to such as set forth in Exhibit C, (ii) if applicable, any software and related technology (collectively, the "**Product Software**"), and (iii) such other Manufacturer IP as Manufacturer may inform VB-NM-OMP in writing.  Manufacturer agrees not to assert any IP against VB-NM-OMP unless the same has been identified prospectively to VB-NM-OMP in writing before the Effective Date, so long as this Agreement is in force.

(d) **Manufacturer Collaborators**.  To the extent Manufacturer engages one or more collaboration groups ("Collaborators") to engage in manufacturing and supply of any Product or component thereof, Manufacturer shall further ensure and warrant that upon VB-NM-OMP receiving the Product, VB-NM-OMP shall have all rights, including all intellectual property rights, necessary to carry out all activities and commercial purposes contemplated in this Agreement, and without any further royalty, cost, or other restriction imposed upon VB-NM-OMP or any sub-distributor or end-user unless set forth herein.  Manufacturer shall obtain from all Collaborators representations and indemnifications which are satisfactory to VB-NM-OMP in its reasonable discretion regarding the use of all rights and technologies connected with the

Electronically Filed - Buchanan - August 29, 2018 - 08:54 AM

manufacturing and supply of the Products. In particular, Manufacturer shall obtain the same from Collaborator Catalent Pharma Solutions, LLC for its Catalent Zydis technology and from Collaborator Srini Pharmaceuticals Ltd of India for its manufacturing and supplying of omeprazole, that the respective components and processes and Product, to the best knowledge of each Collaborator, does not infringe any US patent.

(e) To protect Distributor in the event of any breach of warranty or indemnity pursuant to Sections 9, 10(d), and 11, Manufacturer will also at its sole expense and to the reasonable satisfaction of VB-NM-OMP either (i) obtain insurance in form and substance to address and manage risks for which representations and indemnifications were being sought, wherein such insurance names Distributor as an additional insured and provides coverage with minimum annual limits of $5,000,000 per occurrence and $15,000,000 in the aggregate or (ii) provide an alternative to such insurance acceptable to Distributor.

(f) Consent for Security Interest. In the absence of Distributor's consent, Manufacturer shall not grant a security interest in or permit any lien against any IP asset reasonably necessary for Distributor's conduct under this Agreement including the distribution and sale of Products.

## 11. INDEMNIFICATION.

(a) **Manufacturer's Indemnification of VB-NM-OMP.** Manufacturer agrees to defend, indemnify, and hold harmless VB-NM-OMP, its affiliates and subsidiaries, and the officers, directors and employees of each of them, for all damages, losses, expenses, costs, claims, judgments, liabilities and attorney's fees incurred by VB-NM-OMP (unless caused by the gross negligence or wrongful acts or omissions of VB-NM-OMP) which arise from or in connection with (i) any gross negligent or wrongful act or omission by Manufacturer, (ii) the Products, (iii) third party claims to the extent caused by any actual or alleged defect in any Products, (iv) any actions of any federal, state, local or other government authority with respect to the Products, (v) any infringement of the Products by any patent, copyright, trademark or other claim of IP, or (vi) any third party claims with respect to Manufacturer's IP.

(b) **VB-NM-OMP's Indemnification of Manufacturer**. VB-NM-OMP agrees to defend, indemnify, and hold harmless Manufacturer, its affiliates and subsidiaries, and the officers, directors and employees of each of them, for all damages, losses expenses, costs, claims, judgments, liabilities and attorney's fees incurred by Manufacturer (unless caused by the gross negligence or wrongful acts or omissions of Manufacturer) arising from or in connection with any gross negligent or wrongful act or omission by VB-NM-OMP.

(c) **Indemnification Procedure**. If any written claim is made by any third party against a party to this Agreement for which such party ("**Indemnitee**") seeks indemnification pursuant to this Agreement, the Indemnitee shall promptly notify the other party ("**Indemnitor**") and the Indemnitor shall defend against the claim. The Indemnitor shall have sole control of the defense and all related settlement negotiations and the Indemnitee shall provide the Indemnitor with all reasonable assistance in connection with any claim. The Indemnitor shall consult with the Indemnitee regarding the defense, and shall provide the Indemnitee with reasonably requested information (for audit, securities, and related purposes). The Indemnitor may not settle any

Electronically Filed - Buchanan - August 29, 2018 - 08:54 AM

claim, suit or proceeding in which the Indemnitee is named or otherwise involved without the Indemnitee's prior written consent, except in the case of a cash settlement payable by the Indemnitor in which there is no admission of or imposition of liability as to the Indemnitee.

12.    **CONFIDENTIALITY**.

(a) **Use of Confidential Information**.  The parties agree that Confidential Information (as defined in this Section) may be disclosed by one party (the "**Disclosing Party**") to the other party (the "**Receiving Party**").  During the Term of this Agreement and for a period of three (3) years from the date of termination or expiration of this Agreement, each party shall hold all Confidential Information in confidence and not disclose it to a third party without the prior written consent of the Disclosing Party.  The Receiving Party will take all commercially reasonable precautions to safeguard the confidential nature of such Information.  The Disclosing Party agrees that the same procedures which the Receiving Party would use to protect its own confidential and proprietary information, provided such procedures are not less than a commercially reasonable level, shall be deemed adequate to satisfy the Receiving Party's obligation of confidentiality.  In the event Receiving Party determines there is a reasonable need to share received Confidential Information further with a third party, Receiving Party will: (i) ensure that the third party will be subject to obligations for such Confidential Information which are consistent with the obligations of Receiving Party under this Agreement; and (ii) inform Disclosing Party of any such further disclosure.

(b) **Definition of Confidential Information.**  For purposes of this Agreement, "**Confidential Information**" includes any information furnished by the Disclosing Party that is marked as "Confidential" (i) in the subject line of the e-mail, if disclosure is by e-mail, and (ii) on the first page of any paper or electronic copy of a disclosed document in conspicuous print; or is provided to Manufacturer by Distributor pursuant to Section 5(d)..  If information disclosed, other than information provided pursuant to Section 5(d), is not marked as "Confidential" as set forth in this Section 1(b), within 30 days of disclosure then the information is not confidential. Exclusions to Confidential Information.  Receiving Party shall not be liable for use or disclosure of the Confidential Information of Disclosing Party if the Confidential Information: (i) is in the public domain at the time the Confidential Information is disclosed to Receiving Party or enters the public domain through no breach of this Agreement by Receiving Party; (ii) is known to Receiving Party prior to the time of disclosure to Receiving Party as demonstrated by written documentation or other competent evidence; (iii) is rightfully received by Receiving Party without a duty of confidentiality from a source other than Disclosing Party, provided other source has right to disclose; or (iv) is expressly approved for unrestricted release by Disclosing Party.

(c)    **Rights to Confidential Information**.  This Agreement shall not be construed as granting the Receiving Party expressly, by implication, estoppel or otherwise, any right, title or interest to the Confidential Information received from the Disclosing Party, except for purposes of selling and distributing the Products.

(d) **Return of Confidential Information.**Promptly after any termination or expiration of this Agreement, Receiving Party shall, unless otherwise agreed in writing or this Agreement,

Electronically Filed - Buchanan - August 29, 2018 - 08:54 AM

deliver to Disclosing Party any Confidential Information received by Receiving Party from Disclosing Party.

13.      **TERMINATION AND CHANGE OF CONTROL**.

(a) **Termination Events**.  This Agreement may be terminated as follows:

(i)      **Termination for Convenience**.  Distributor shall have a right of termination for convenience upon two hundred seventy (270) days written notice to Manufacturer.

(ii)      **Termination for Breach, Insolvency, or Violation**.  Upon any of the following, if not cured with thirty (30) days of receipt of written notice, of (i) the other party's breach of this Agreement or any of the obligations imposed by this Agreement, (ii) the other party's insolvency, voluntary or involuntary bankruptcy, suspension of business, assignment of assets for the benefit of creditors, voluntary dissolution, or appointment of a trustee or receiver for all or a substantial portion of the party's assets, or (iii) notice from the other party, any federal, state, local or other governmental authority, a third party, or other source that a Product or any portion thereof (a) violates the intellectual property rights or any other rights of any third party; (b) violates any applicable law or is subject to an injunction; or (c) may otherwise create liability for the party.

(b) **Obligations upon Termination**.  Upon the expiration or the termination of this Agreement for any reason, the parties shall have the following rights and obligations:

(i)      **Distributor/Supplier Relationship**.  Subject to this Section 13, Manufacturer shall have no right to require VB-NM-OMP to continue to act as a distributor of the Products, and VB-NM-OMP shall have no right to require Manufacturer to continue to supply Products to VB-NM-OMP.

(ii)      **Sums Due**.  All sums owed by either party to the other shall immediately become due and payable.

(iii)      **Repurchase of Remaining Inventory**.  Within thirty (30) days after the effective date of the expiration or termination, VB-NM-OMP and Manufacturer may mutually agree that Manufacturer will repurchase from VB-NM-OMP, at the then current Contract Price as defined in Section 1(a), any Products that VB-NM-OMP requests that are (i) titled in the name of VB-NM-OMP, (ii) in good and saleable condition, and (iii) unaltered from their original form and design ("**Remaining Inventory**").  As part of the agreement, Manufacturer shall (i) pay reasonable shipping and other costs associated with the return of the Remaining Inventory, and (ii) complete the repurchase within thirty (30) days of the date of the mutual agreement.  If there is no mutual agreement regarding the repurchase of the Remaining Inventory as provided in this Section 1(b), or if there is a dispute regarding the Remaining Inventory, then (i) VB-NM-OMP shall have the right to sell any Remaining Inventory, (ii) VB-NM-OMP shall remain an authorized distributor of the Products for the limited purpose of selling the Remaining Inventory,

Electronically Filed - Buchanan - August 29, 2018 - 08:54 AM

and (iii) this Agreement shall remain in effect for the limited purpose of VB-NM-OMP selling the Remaining Inventory until all of the Remaining Inventory is sold.

(c) **Survival upon Termination.**The following obligations shall survive termination of this Agreement, for any reason: (i) the payment obligations and offset rights specified in Section 4; (ii) the insurance obligations specified in Sections 6(f) and 7(d), (iii) Manufacturer's warranty obligations specified in Section 9; (iv) the intellectual property protections and obligations specified in Section 10; (v) the confidentiality obligations specified in Section 12; (vi) the indemnification provisions specified in Section 11; (vii) VB-NM-OMP's right to sell any Remaining Inventory as specified in Section 13(b) (and such additional provisions of this Agreement that are necessary to facilitate VB-NM-OMP's sale of the Remaining Inventory); (viii) the limitation of liability and limitation of remedies specified in Section 14; and (ix) the interpretation provisions specified in Section 15**.** Expiration or termination of this Agreement shall not preclude the non-breaching party from pursuing all remedies available at law or at equity.

(d) **Change in Control.** This provision shall apply in case of a change in control of a party as defined herewith.

(i) The parties intend that Manufacturer will retain control of manufacturing and supply subject to rolling forecasts from VB-NM-OMP. In the event of a change of control of VB-NM-OMP or its parent company if applicable, manufacturing and all other rights assigned under this Agreement to Manufacturer shall remain therewith.

(ii) In the event of a change of control of Manufacturer, then VB-NM-OMP shall have the exclusive right to make and commercialize Products in the Field and in the Territory as granted under the Agreement as well as the right to assume the beneficial position of Manufacturer's relationship with any Collaborator to make and commercialize the Product in the Field and in the Territory without further consideration or compensation to Manufacturer's successor. At its sole discretion, in the event of a change of control of Manufacturer, VB-NM-OMP will have the right to (1) obtain a license from Manufacturer (or its successor as applicable) for all rights to the Products, including manufacturing, subject to no more than a maximum running royalty rate of 7.00% of Net Sales (whereby, unless mutually agreed otherwise, "**Net Sales**" shall correspond to gross revenues received from the sale of Products less sales and/or use taxes actually paid, import and/or export duties actually paid, outbound transportation prepaid or allowed, and amounts allowed or credited due to returns (not to exceed the original billing or invoice amount)), with such maximum royalty rate contingent upon VB-NM-OMP securing no less favorable terms with any Manufacturer Collaborators as Manufacturer had obtained; or (2) negotiate purchase from and sale of Products in connection with the successor in interest of Manufacturer or other third party subject to the sale provisions described below.

(iii) In the event that VB-NM-OMP should sell its rights hereunder to any third party, Manufacturer shall share in a specified percentage of the net proceeds of revenues relating to the subject matter of this Agreement and received by VB-NM-OMP, according to the following schedule, where "Year" is defined as the first full calendar year following the initial full regulatory approval which permits sale of the Products herewith, so long as this Agreement

Electronically Filed - Buchanan - August 29, 2018 - 08:54 AM

is in force: (i) Year 1, 10%; (ii) Year 2, 9%; (iii) Year 3, 8%; (iv) Year 4, 7%; and (v) Year 5 and beyond, 5%. In no event will Manufacturer's aggregate share of Contract Price be less than $3.5M nor more than $7.5M if such amounts are realizable depending on such revenues received by VB-NM-OMP.

(iv)     The parties recognize that the parent of VB-NM-OMP may engage in independent efforts and enterprises, directly or via other entities, unrelated to activities relevant to this Agreement. In the event of a change of control in the parent of VB-NM-OMP, any amount due to be paid to Manufacturer shall be based only on the proceeds actually received by the parent for the purchase of Products described herein.

(v)     "Change of Control" means any of the following events: (i) any Person is or becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 of the Securities Exchange Act of 1934, as amended, except that a person shall be deemed to have "beneficial ownership" of all shares that any such person has the right to acquire, whether such right is exercisable immediately or only after the passage of time), directly or indirectly, of over 50% of the total voting power of all classes of capital stock then outstanding of Manufacturer normally entitled to vote in elections of directors; (ii) a party consolidates with or merges into another corporation or entity, or any corporation or entity consolidates with or merges into the party, in either event pursuant to a transaction in which over 50% of the total voting power of all classes of capital stock then outstanding of the party normally entitled to vote in elections of directors is changed into or exchanged for cash, securities or other property; (iii) a party conveys, transfers or leases all or substantially all of its assets relating to this agreement to any person; or (iv) (a) during any period of two consecutive years, commencing after the Effective Date, individuals who immediately after the Effective Date constituted the Board of Directors of a party (together with any new directors whose election by such Board or whose nomination for election by the shareholders of the party was approved by a vote of 66 2/3% of the directors then still in office who were either directors at such time or whose election or nomination for election was previously so approved) cease for any reason to constitute a majority of the Board of Directors of the party then in office and (b) a new majority of the board is comprised of directors who are officers of a competitor of the other party. For avoidance of doubt, "Change of Control" shall not include a public or private offering or a venture or mezzanine financing round for a party, or the election of a new majority on a party's Board of Directors except where a venture or mezzanine financing round is funded by a competitor of the other party, or such new majority is comprised of officers of a competitor in which case the venture or mezzanine financing round or new majority shall be considered a Change of Control.

14.     **DISPUTES**.

(a) **Limitation of Liability and Remedy**. Except as otherwise provided in this Agreement, no party shall be liable to the other party for punitive or exemplary damages.

(b) **Dispute**. Except in the case of a breach of a confidentiality obligation in Section 12, if a dispute arises between the parties regarding their rights or obligations under or related to this

Electronically Filed - Buchanan - August 29, 2018 - 08:54 AM

Agreement, the parties shall first attempt to settle the dispute by direct discussions at the vice-president or higher level. If the dispute cannot be settled by the parties by direct discussions, then the parties agree to endeavor to settle the dispute in an amicable manner by mediation administered by the American Arbitration Association under its Commercial Mediation Rules, with attempted dispute resolution to occur in Kansas City, Missouri. Thereafter, any unresolved dispute arising from or relating to this Agreement or a breach of this Agreement shall be resolved as provided by this Agreement and by law. In the event a party reasonably determines that injunctive relief is needed, the parties consent to jurisdiction in the Western District of Missouri.

(c) **Attorneys' Fees**. Should any party employ an attorney for the purpose of enforcing this Agreement, the prevailing party shall receive its reasonable attorneys' fees and costs.

## 15. INTERPRETATION AND MISCELLANEOUS.

(a) **Notice**. All notices and other communications ("**Notices**") shall be in writing and may be delivered (i) in person, with the date of notice being the date of personal delivery, (ii) by United States Mail, postage prepaid for certified or registered mail, return receipt requested, with the date of notice being the date of the postmark on the return receipt, (iii) by fax, with confirmation of the transmittal of the fax and a copy of the fax deposited on the same day in the United States Mail, with the date of notice being the date of the fax, (iv) by e-mail, with confirmation of sending of the e-mail and a copy of the e-mail deposited on the same day in the United States Mail, with the date of notice being the date of the e-mail, (v) by nationally recognized delivery service such as Federal Express, with the date of notice being the date of delivery as shown on the confirmation provided by the delivery service. Notices shall be addressed to the following addresses, or such other address as one party shall provide the other parties, where each party shall update the other as applicable from time to time.

If to Manufacturer: NewMarket Pharmaceuticals LLC
Attn: Mark Ridall
621 Executive Drive, Princeton, NJ 08540 USA
Phone: (609) 408-2397, Fax: 609.252.0600
Email _____

If to VB-NM-OMP: VetBridge Product Development Subsidiary I (NM-OMP), LLC
Attn: Kevin Speltz
1302 S 59th St, St Joseph, MO 64507 USA
Phone: (816) 364-5786, Fax: _____
Email _____

(b) **Assignment**. Neither party may (i) assign, subcontract, delegate or otherwise transfer this Agreement or any of its rights or obligations, or (ii) contract with third parties to perform any of the party's obligations, except as contemplated in this Agreement, without the other party's prior written consent.

(c) **No Minimum Requirements**. Unless specifically set forth otherwise in this Agreement, VB-NM-OMP is not required or obligated to (i) purchase or pay for any minimum amount of Products, (ii) make payments for Products regardless of purchases of Products (that is, no "take or pay" requirement), or (iii) comply with any quota, sales targets, sales minimum, or other sales objectives. Statements by VB-NM-OMP regarding present or future markets, conditions, expectations, orders, estimates, forecasts, outlooks, objectives, plans, goals, intentions and other words or phrases of similar import are only beliefs about the present and future and do not constitute any obligation or contract of VB-NM-OMP. VB-NM-OMP's only obligations to purchase Products or otherwise pay money to Manufacturer are set forth in VB-NM-OMP's purchase orders that are identified in Section 5(a).

(d) **Failure or Omissions**. No delay or failure by either party to exercise any right or remedy under this Agreement, and no partial or single exercise of that right or remedy, shall constitute a waiver of that or any other right or remedy, unless otherwise expressly provided in this Agreement.

(e) **Timeliness**. Unless otherwise waived in writing, the parties agree that time is of the essence.

(f) **Severability**. If any part of this Agreement shall be determined to be invalid, illegal or unenforceable, or declared null and void by any court of competent jurisdiction, then (i) such part shall be reformed, if possible, to conform to the law and (ii) in any event the remaining parts of this Agreement shall be fully effective and operative insofar as reasonably possible.

(g) **Waiver**. Waiver of any term, condition or breach of this Agreement shall not be deemed to constitute the waiver of any other term or condition or any other or subsequent breach

(h) **Independent Contractor**. VB-NM-OMP and Manufacturer are independent businesses. VB-NM-OMP and Manufacturer (i) do not have and will not have the power, right, or authority, express or implied, and (ii) have not and will not represent that they have any power, right or authority, to bind the other party or to assume or to create any obligation or responsibility, express or implied, on behalf of the other party. VB-NM-OMP and Manufacturer have vendor and vendee relationship. Nothing stated in this Agreement shall be construed as constituting the relationship of employer and employee, franchiser and franchisee, master and servant, principal and agent, partnership, or joint venture between the parties.

(i) **Force Majeure**. The obligations of either party to perform under this Agreement will be excused during each period of delay caused by acts of God, shortages of power, materials or transportation, government orders, labor strikes, work stoppages or disruptions, war (even if not declared), hostilities, terrorism, or embargos which are beyond the reasonable control of the party obligated to perform ("**Force Majeure Event**"). In the event of a Force Majeure Event, such party shall: (i) immediately notify the other party of the Force Majeure Event and its expected duration, and (ii) take all reasonable steps to recommence performance as soon as possible. In the event that any Force Majeure Event delays a party's performance for more than 90 days following notice, the other party may terminate this Agreement immediately upon written notice to such party.

(j) **Entire Agreement**. This Agreement and its Exhibits constitute the entire agreement between the parties, and supersede all prior oral and written agreements and understandings between the parties. This Agreement cannot be modified or amended, except in writing signed by all parties. In the event of any inconsistency between this Agreement and its Exhibits, this Agreement shall control. For avoidance of doubt, this Agreement supersedes the Letter of Intent of May 14, 2014.

(k) **Governing Law and Jurisdiction**. This Agreement shall be governed by Missouri law without consideration of conflict of laws principles.

(l) **Counterparts and Facsimile**. This may be signed in counterpart and facsimile.

## 16. SIGNATURES.

Accepted and agreed:

NEWMARKET PHARMACEUTICALS LLC

Date: _____, 20__

By: _____

Print Name: _____

Title: _____

VETBRIDGE PRODUCT DEVELOPMENT SUBSIDIARY I (NM-OMP), LLC

Date: June 27th , 20__

By: _____

Print Name: Kevin Spiltz

Title: President

Exclusive Distribution Agreement - 16 of 21
v20140620ForExecution

(j) **Entire Agreement**. This Agreement and its Exhibits constitute the entire agreement between the parties, and supersede all prior oral and written agreements and understandings between the parties. This Agreement cannot be modified or amended, except in writing signed by all parties. In the event of any inconsistency between this Agreement and its Exhibits, this Agreement shall control. For avoidance of doubt, this Agreement supersedes the Letter of Intent of May 14, 2014.

(k) **Governing Law and Jurisdiction**. This Agreement shall be governed by Missouri law without consideration of conflict of laws principles.

(l) **Counterparts and Facsimile**. This may be signed in counterpart and facsimile.

## 16. SIGNATURES.

Accepted and agreed:

Date: June 27, 2014

NEWMARKET PHARMACEUTICALS LLC

By: _____

Print Name: _Marc Riddell_

Title: _President_

Date: June 27th, 20__

VETBRIDGE PRODUCT DEVELOPMENT SUBSIDIARY I (NM-OMP), LLC

By: _____

Print Name: _Kevin Schultz_

Title: _President_

Case 5:18-cv-06147-BCW   Document 13-1 *SEALED*   Filed 10/19/18   Page 17 of 22

Electronically Filed - Buchanan - August 29, 2018 - 08:54 AM

**EXHIBIT A**

**PRODUCTS, TRANSFER PRICE MODEL, AND
MANUFACTURER'S END-USER WARRANTY**

**A.1. Products.**

[to be completed]

**A.2. Transfer Price Model.**

[to be completed]

**A.3. Manufacturer's End-User Warranty.**

[to be completed]

Case 5:18-cv-06147-BCW   Document 13-1 *SEALED*   Filed 10/19/18   Page 18 of 22

## EXHIBIT B

## PRODUCT DEVELOPMENT

B.1.    VB-NM-OMP shall provide payments to Manufacturer according to the following schedule. For the avoidance of doubt, each Milestone shall be considered a condition precedent before a given item and payment becomes due and payable. VB-NM-OMP shall not be obligated to contribute more than $1,000,000 prior to the execution of this Agreement. VB-NM-OMP shall not be obligated to contribute more than $4,000,000 in the aggregate to Manufacturer or any third party. All funds paid by VB-NM-OMP shall be immediately refundable to VB-NM-OMP if any such are used not in compliance with Section 1(d) of the Agreement body.

B.2.    Manufacturer shall have the right to manage all aspects of product development efforts. VB-NM-OMP shall have the right to review and have input on labeling and product claims for the Products. Manufacturer shall keep VB-NM-OMP reasonably apprised of status, progress, and the expenditure of funds.

As set forth in Table B1, the following items and Milestones shall be achieved to the reasonable mutual satisfaction of the parties.

Table B1.  Stage 1 Funding.

| Item | Milestone | Amount of Payment by VB-NM-OMP |
|------|-----------|-------------------------------|
| M1 | The mutual execution of the Letter of Intent of May 14, 2014, and the release of any liens and security interest in Manufacturer's patents and all other intellectual property rights of Brian McDonald under the terms and conditions of that certain Security Agreement dated June 11, 2013. Manufacturer confirms that payment for this item was received prior to execution of this Agreement. | $250,000 (remitted on behalf of VB-NM-OMP prior to execution of this Agreement) |
| M2 | Execution of the Operating Agreement of VB-NM-OMP's parent LLC. | $250,000 (to be remitted on behalf of VB-NM-OMP upon the milestone and prior to execution of this Agreement) |
| M3 | The mutual execution of this Agreement. | $500,000 |
| | | |

Total for the above Milestones:  $1,000,000

B.3.    Upon completion of the Stage 1 Funding, Manufacturer shall proceed and advance the development of the Products including by directly funding the efforts, but not to exceed a total of $3 million in addition to the Stage 1 Funding, up to a projected grand total of $4 million dollars. Financial reconciliation and project progress reporting will occur with reimbursement to

Electronically Filed - Buchanan - August 29, 2018 - 08:54 AM

Manufacturer from VB-NM-OMP on annual dates set as August 1, November 1, February 1, and May 1 beginning on August 1, 2014 and continuing thereafter. An appendix shall be attached to this Exhibit and referred to as Appendix B -Product Development Gantt Chart, which shall be updated from time to time.

B.4. VB-NM-OMP shall contribute continued reimbursement funding at a level of approximately $300,000 to $600,000 per quarter based on the actual expenditures of Manufacturer for developing the Products. If, however, there is a failure to reach any one or more significant milestone as outlined in the Appendix B, then VB-NM-OMP shall in its discretion have the right to reduce or suspend its funding contribution for any subsequent quarter. Significant milestones shall be considered to include: (i) the payment to third parties of any necessary licensing fees; (ii) the obtaining of continued adequate supply of active product ingredient (API); (iii) the meeting of any quality control inspection or audit according to the reasonable standards in the drug manufacturing industry, whether or not mandatory under any applicable regulatory system; (iv) the progress and approval for the Chemistry, Manufacturing, and Controls section, or any portion thereof; (v) pre-clinical unit progress; (vi) clinical trial progress including the design, implementation, completion, and reporting of clinical studies for any safety, efficacy, or marketing purpose, whether or not mandated by regulation; (vii) post-marketing studies that are mutually agreed upon by the parties; (viii) the payment of any necessary official government fees; and/or (ix) any other requirement set forth by the FDA Center for Veterinary Medicine or other applicable or equivalent group with appropriate authority to impose requirements.

(a) As a further reasonable basis for VB-NM-OMP to assess the progress of product development and/or the reaching of a given milestone, VB-NM-OMP shall have the right to engage the services of one or more consultants with expertise in product development, regulatory affairs, or clinical trials. Manufacturer shall permit such one or more consultants access to monitor and audit any relevant information and events during the course of developing the Products, including in conjunction with any Collaborators as may reasonably be facilitated. In the event such consultant provides a written opinion which (a) indicates that there are reasonable grounds for concern that further investment of resources will not likely result in a favorable outcome, e.g., depending on the results of pre-clinical development or the consultant's professional judgment upon review of the clinical trial results of a pivotal trial, or that a period of additional review is needed; or (b) recommends that the product development efforts be suspended or ended, then VB-NM-OMP shall have the right to reduce, suspend, or permanently discontinue funding the product development program. Each party shall be responsible for subjecting its respective consultants to be bound by obligations regarding Confidential Information which are substantially similar to those in Section 12 of this Agreement.

**EXHIBIT C**

**MANUFACTURER IP**

Manufacturer IP shall include such items as set forth in the Agreement including Patent Rights. The Patent Rights shall include those of the Manufacturer listed below..

"Patent Rights" shall include all patents and patent applications, and all divisionals, continuations, continuations-in-part, counterparts, re-examinations, reissues, extensions, registrations, and supplementary or complementary certificates and the like, both domestic and foreign, and items which claim the benefit of priority to any of the foregoing. For avoidance of doubt, "Patent Rights" shall mean all patent rights whether in whole or in part, directly or indirectly owned, licensed, and/or optioned (with the right to grant sub-licenses) by the indicated party or an affiliate thereof, as of the Effective Date or during the term of this Agreement, which relate to Products, and their development, manufacture, or use in the Field and in the Territory. Patent Rights obtained or acquired by, or licensed to the indicated party or an affiliate thereof during the term of this Agreement shall be considered added automatically.

1. <u>NewMarket Pharmaceuticals LLC.</u>
   a. Patent Rights including at least the items listed in Table C1.

Table C1.

| Item | Country | Patent Application or Patent No. | Filing Date | Title |
|------|---------|--------------------------------|-------------|-------|
| 1 | US | 61437763 | January 31, 2011 | |
| 2 | US | 13/343,692, issued as 8,722,636 | January 4, 2012; issued May 13, 2014 | Animal treatments |
| 3 | US | 14/275,019 | May 12, 2014 | |
| 4 | US | 14/275,031 | May 12, 2014 | |
| 5 | WO | PCT/US2012/020242 | January 4, 2012 | |
| 6 | US | 61/674,435 | 23.07.2012 | |
| 7 | US | 61/678,355 | 01.08.2012 | |
| 8 | US | 61/641,509 | 02.05.2012 | |
| 9 | WO | PCT/US2012/070031 | Dec. 17, 2012 | Pharmaceutical compositions for direct systemic introduction |
| | | | | |
| | | | | |

   b. NewMarket's Licensed Rights: _____[to be completed]_____.

Electronically Filed - Buchanan - August 29, 2018 - 08:54 AM

2. Collaborator: <u>Catalent Pharma Solutions, LLC</u> of _____ [principal business address].

    a. Patent Rights including at least the items listed in Table C2. [to be completed]

Table C2.

| Item | Country | Patent Application or Patent No. | Filing Date | Title |
|------|---------|--------------------------------|-------------|-------|
|      |         |                                |             |       |
|      |         |                                |             |       |
|      |         |                                |             |       |
|      |         |                                |             |       |
|      |         |                                |             |       |
|      |         |                                |             |       |
|      |         |                                |             |       |

3. Collaborator: <u>Srini Pharmaceuticals Ltd.</u> of Hyderabad, India, _____ [principal business address].

    a. Patent Rights including at least the items listed in Table C3. [to be completed]

Table C3.

| Item | Country | Patent Application or Patent No. | Filing Date | Title |
|------|---------|--------------------------------|-------------|-------|
|      |         |                                |             |       |
|      |         |                                |             |       |
|      |         |                                |             |       |
|      |         |                                |             |       |
|      |         |                                |             |       |
|      |         |                                |             |       |
|      |         |                                |             |       |