IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

| | | |
|---|---|---|
| VetBridge Product Development Subsidiary I (NM-OMP), LLC, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 5:18-CV-06147-BCW |
| vs. | ) ) | |
| NewMarket Pharmaceuticals, LLC, | ) ) | |
| Defendant. | ) ) | |

## DECLARATION OF KEVIN SPELTZ

I, Kevin Speltz, being over the age of 18, under the penalties of perjury, state as follows:

1.      My name is Kevin Speltz. I am the President of VetBridge Product Development Subsidiary I (NM-OMP), LLC ("**VetBridge**"), a Missouri limited liability company, with its principal and only place of business located at 1302 S. 59th Street, St. Joseph, Missouri 64508. I am also the President and a member of the Board of Managers of VetBridge Animal Health, LLC ("**VAH**"), a Missouri limited liability company, with its principal place of business located at 1302 S. 59th Street, St. Joseph, Missouri 64508. VAH is a member and through its Board of Managers serves as the Manager of VetBridge. In those capacities, I have personal knowledge of the facts stated herein.

2.      VAH was formed on October 14, 2013 to pursue the development of specialty products for the veterinary industry and all activities related or incidental thereto.

3.      VetBridge was formed on June 26, 2014 to pursue the development of a rapidly dissolving formulation of Omeprazole, including Omeprazole direct systemic introduction compositions for use in equine animals, including veterinary medicine, and all activities related or incidental thereto, through the Exclusive Distribution and License Agreement, which is the subject of this action.

4.      The members of VetBridge include:

    a.   VAH;

**EXHIBIT 2**

b. Kevin W. Speltz and Nancy Neff Speltz Joint Revocable Trust ("**Speltz Trust**"), Trustees, Kevin W. Speltz and Nancy Neff Speltz, both of whom reside in St. Joseph, Missouri;

c. Patterson Management, LP ("**Patterson**"), a Minnesota limited partnership, with its principal place of business in St. Paul, Minnesota;

d. Animal Health International, Inc. ("**AHII**"), a Colorado corporation, with its principal place of business in St. Paul, Minnesota;

e. MWI Veterinary Supply Inc. ("**MWI**"), a Delaware corporation, with its principal place of business in business Boise, Idaho;

f. Midwest Veterinary Supply, Inc. ("**Midwest Vet**"), a North Dakota corporation, with its principal place of business in Lakeville, Minnesota; and

g. Dana4 Enterprises, Inc. ("**Dana4**"), a California corporation, with its principal place of business in Laguna Niguel, CA.

5.  VetBridge and its members are companies engaged in the successful marketing, sale and distribution of animal healthcare products and veterinary supplies, including vaccines and pharmaceuticals, both nationally and internationally.

6.  Clipper Distributing Company, LLC ("**Clipper**"), a Missouri limited liability company, with its principal place of business located at 1302 S. 59th Street, St. Joseph, Missouri 64508, was retained by VetBridge to provide all the distribution and logistics for VetBridge in connection with its performance under the Agreement. I am also the President of Clipper.

7.  It is my understanding that NewMarket Pharmaceuticals, LLC ("**NewMarket**") is a Delaware limited liability company, which maintains its principal place of business in Trenton, New Jersey. Mark Ridall is the President of NewMarket. It is my understanding that NewMarket is engaged in developing drug delivery systems to enhance the quality of treatment for animals, by employing state of the art formulation technology to develop and adapt new oral delivery technologies for established medicines that exist in outdated or inefficient delivery systems.

8.  At the time the Exclusive Distribution and License Agreement, which is the subject of this action, was entered into, NewMarket's counsel represented to VetBridge that the members of NewMarket were Mark Ridall, Brian McDonald, Matthew Pargament and Joseph Delany. NewMarket has since advised that Mark Ridall, Brian McDonald and Joseph Delany are residents of New Jersey, and

2

that Matthew Pargament is a resident of Florida. The only interaction VetBridge had with any of the referenced members was with Mark Ridall and Matthew Pargament.

9. On or about May 14, 2014, VetBridge entered into a Letter of Intent ("LOI") with NewMarket to fully acquire the exclusive marketing and distribution rights in the United States to NewMarket's rapidly dissolving formulation of omeprazole ("**Omeprazole DSI**"). Specifically, VetBridge proposed to acquire a fully formulated, finished, and ready to sell Omeprazole DSI product for use, initially in horses, for which it would have exclusive rights to sell in the United States. Although VetBridge originally dealt with NewMarket exclusively with respect to its Omeprazole DSI product, NewMarket represented that it had four or five other drugs it was working on including Marbofloxacin DSI (an antibiotic) and Flunixin DSI (an anti-inflammatory drug) that it was willing to offer to VetBridge on an exclusive basis to develop and either distribute or sell to one of the big pharmaceutical companies.

10. The LOI was negotiated and jointly drafted by counsel for NewMarket, Anthony S. DiSandro, of Stevens & Lee, located in King of Prussia, PA 19406 and Tom Stahl of Lathrop Gage, LLP ("**Lathrop**"), in Kansas City, Missouri, with substantial input and direct communications between myself, Mark Ridall, and Tom Overbay, DVM, a partner in Expedite Animal Health ("**Expedite**"), who is located in Louisburg, Kansas. Tom Overbay initially worked as a consultant to NewMarket and acted as NewMarket's liaison to VetBridge, and, as represented to me by Mark Ridall, was subsequently employed by NewMarket directly as an employee.

11. It is my understanding that Expedite is a fee for service business development entity working in the animal health space, which provides, among other things, technology scouting, technology assessment, and, for those assets offering commercial value, assistance in their development to a valuation point, be that registration and commercialization or out-licensure, working with biologicals, pharmaceuticals, topical pesticides, devices, and "nutraceuticals." It's my understanding that Tom Overbay has extensive experience in product development and obtaining required regulatory approvals.

12. The LOI, after being signed by Mark Ridall, on behalf of NewMarket, was accepted and signed by myself for VetBridge, in St. Joseph, Missouri.

3

13.     Effective, June 27, 2014 ("**Effective Date**"), for a term of thirty (30) years, NewMarket, as Manufacturer, and VetBridge, as Distributor, entered into an Exclusive Distribution and License Agreement ("**Agreement**") with respect to the development, manufacture, supply, marketing and distribution of NewMarket's products, consisting of rapidly dissolving formulations of omeprazole (used in the treatment and prevention of ulcers), including omeprazole direct system introduction (DSI) compositions for use in all non-human animals, especially equine animals (hereinafter, "**Omeprazole DSI Products**"), as well as the licensing of all of NewMarket's intellectual property and patent rights relating thereto. A true and correct copy of the Agreement is attached hereto as **Exhibit A** and is incorporated herein by reference. I signed the Agreement on VetBridge's behalf in Missouri.

14.     Although the initial draft of the Agreement was prepared by Stephen Penner, formerly with Lathrop and now deceased, as well as Tom Stahl, the terms and language of the Agreement were negotiated directly between myself (for VetBridge) and Tom Overbay (for NewMarket), with Tom Overbay providing language and terms that he advised were acceptable to Mark Ridall and were included in the Agreement. I have met and spoken with Tom Overbay on numerous occasions, both in person and by phone, in Kansas City, Missouri, throughout VetBridge's contractual relationship with NewMarket, concerning the Agreement and related issues, some of which are described below.

15.     Pursuant to the Agreement, and in exchange for its payment of $4,000,000, NewMarket, among other things,

(a)     Appointed VetBridge as its "sole and exclusive authorized wholesale distributor and reseller to advertise, promote, market, distribute, supply and sell ("Distribute" or "Distribution")" NewMarket's Omeprazole DSI Products, including (i) rapidly dissolving formulations of omeprazole (for both the treatment and prevention of ulcers), including omeprazole direct system introduction (DSI) compositions for use in all non-human animals, especially equine animals; (ii) revisions, alterations or improvements to the NewMarket's Omeprazole DSI Products; and (iii) new veterinary products developed by NewMarket in the contractually agreed upon Field, consisting of the "veterinary use of rapidly dissolving formulations of omeprazole in all non-human animals including especially horses and other equine animals," within the defined Territory, consisting of "the veterinary market in the United States of America including all of its states, districts, territories and possessions, including the District of Columbia"; and

(b)     Granted VetBridge, "in connection with the Distribution of the [Omeprazole DSI] Products in the Territory, an exclusive, transferable, perpetual and royalty-free right

4

and license to use, sell, offer for sale, import, and Distribute, with the right to sub-license," among other things, "[NewMarket's] IP associated with the [Omeprazole DSI] Products including but not limited to" NewMarket's Patent Rights, "including all patents and patent applications, and all divisionals, continuations, continuations-in-part, counterparts, re-examinations, reissues, extensions, registrations, and supplementary or complementary certificates and the like, both domestic and foreign, and items which claim the benefit of priority to any of the foregoing," "whether in whole or in part, directly or indirectly owned, licensed, and/or optioned (with the right to grant sub-licenses) by [NewMarket] or an affiliate thereof, as of the Effective Date or during the term of this Agreement, which relate to [the Omeprazole DSI] Products, and their development, manufacture, or use in the Field and in the Territory," including, but not limited to, the following:

| Item | Country | Patent Application or Patent No. | Filing Date | Title |
|------|---------|----------------------------------|-------------|-------|
| 1 | US | 61/437763 | 01/31/2011 | |
| 2 | US | 13/343,692; issued as 8,722,636 | 01/04/2012; issued 05/13/2014 | Animal treatments |
| 3 | US | 14/275,019; issued as 10,022,361 | 05/12/2014; issued 07/18/2018 | Animal Treatments |
| 4 | US | 14/275,031; issued as 9,402,835 | 05/12/2014; issued 08/02/2016 | Animal Treatment |
| 5 | WO | PCT/US2012/020242 | 01/04/2012 | Animal Treatment |
| 6 | US | 61/674,435 | 07/23/2012 | |
| 7 | US | 61/678,355 | 01/08/2012 | |
| 8 | US | 61/641,509 | 02.05.2012 | |
| 9 | WO | PCT/US2012/070031 | 12/17/2012 | Pharmaceutical compositions for direct systemic introduction |
| 10 | US | 14/398,085 | 10/30/2014 | |
| 11 | US | 16/014,290 | 06/21/2018 | |

(Hereinafter collectively referred to as the "**IP/Patent Rights**").

16.    In connection with the Agreement, VetBridge retained Doug Rupp as its FDA consultant to assist VetBridge in performing its due diligence prior to entering into the Agreement, and to monitor and audit NewMarket's efforts to obtain approval of its Omeprazole DSI Products with the Federal Drug and Food Administration's Center for Veterinary Medicine ("**FDA/CVM**"), as provided for in the Agreement at Exhibit B, ¶B.4(a). It's my understanding that Doug Rupp resides in Wilmington, North Carolina. Doug Rupp is a regulatory compliance executive with substantial experience and expertise in

gaining regulatory approval for pharmaceutical and medicated feed additive animal products in both domestic and international markets.

17.     Dr. David Rock, one of the named inventors of some of NewMarket's IP/Patent Rights served as NewMarket's Vice President of Research & Development, and was principally responsible for leading NewMarket's efforts to obtain FDA/CVM approval. Dr. Rock's wife, Sandra Rock, also worked for NewMarket and did their bookkeeping. Dr. Rock and his wife no longer work for NewMarket and reside in California, Missouri.

18.     With respect to its marketing efforts for the Omeprazole DSI Products, VetBridge retained the services of Marv Jahde of The Solutions Group, LLC, who is located in Overland Park, Kansas, who has expertise in the equine marketplace, to assist in the development of its marketing plans, forecasting and sales projections related to the Omeprazole DSI Products.

19.     Additionally, Lathrop (out of its Kansas City and Overland Park offices) was engaged to assist VetBridge in registering the trademarks it intends to use with respect to the Omeprazole DSI Products with the United States Patent and Trademark Office ("**USPTO**"); although registration cannot be completed until the products are actually in use. VetBridge has continued to file extensions with the USPTO so that it does not lose the right to obtain registration for these names.

20.     Brandon McKibbon, who formerly served as Clipper's CFO, performs all of the accounting for VetBridge and was responsible for paying NewMarket's invoices for VetBridge's $4,000,000 investment. Brian McKibbon resides in Atchison, Kansas.

21.     Pursuant to the Agreement, VetBridge's funding obligation for the development of the Omeprazole DSI Products was capped at $4,000,000. (Agreement at Exhibit B, ¶3.B ("Upon completion of the Stage 1 Funding, [Distributor] shall proceed and advance the development of the [Omeprazole DSI] Products including by directly funding the efforts, but not to exceed a total of $3 million in addition to the Stage 1 Funding [of $1 million], up to a projected grand total of $4 million dollars.").

22.     VetBridge's $4,000,000 investment was to be used by NewMarket "solely for direct expenses related to the development of the [Omeprazole DSI] Products," including, but not limited to, the

6

direct expenses associated with preparing, prosecuting and obtaining approval of a New Animal Drug Application ("**NADA**") for such products, both for treatment and prevention, from the FDA/CVM and conducting necessary field clinical studies through a third party Contract Research Organization ("**CRO**"), VetPharm, Inc. ("**VetPharm**") in connection with the same. (Agreement, ¶1(d)). VetBridge's investment was not to be used to pay salaries, wages, payroll taxes and other administrative expenses and overhead.

23.     Paragraph 1(d) of the Agreement further provides that "any use of funds by [NewMarket] contrary to [the foregoing restriction] shall provide [VetBridge] with the right to immediate repayment from [NewMarket] of all monies paid to [NewMarket] by [VetBridge]."

24.     Except for VetBridge's payment of $4,000,000, NewMarket was responsible for providing any additional funding and performing all other steps and tasks necessary to provide VetBridge with the Omeprazole DSI Products in a saleable form for distribution, including, but not limited to, obtaining the necessary approvals from the FDA/CVM and manufacturing and supplying VetBridge with the Omeprazole DSI Products in a saleable form for distribution.

25.     Quarterly invoicing from NewMarket for VetBridge's $4,000,000 investment was provided to VetBridge by Bryan Ridall, Mark Ridall's son, who worked for NewMarket. Bryan Ridall was also responsible for providing VetBridge with at least quarterly project status updates to keep VetBridge apprised of all aspects of the development of the Omeprazole DSI Products, including securing FDA/CVM approval.

26.     In November 2015, Bryan Ridall, on NewMarket's behalf, confirmed to VetBridge that it had satisfied its funding obligation, and that NewMarket would fund the final stages of the project to obtain approval from the FDA/CVM and provide VetBridge with its Omeprazole DSI Products in a saleable form for distribution.

27.     On February 10, 2016, Mark Ridall and Tom Overbay asked me if VetBridge would invest an additional $806,304.44, to cover cost overruns incurred in the first quarter of 2016, which were

primarily to cover invoices from VetPharm. (2/10/2016 NewMarket Invoice, **Exhibit B**). I agreed to present their request to VetBridge's Board of Managers.

28.     On or about March 15, 2016, while I was traveling to the Bahamas, I received an email from Denni O. Day ("**Day**"), VetPharm's President, regarding past due invoices allegedly owed by NewMarket, which she indicated were in an amount in excess of $800,000, and advised of VetPharm's intent to shut down the clinical field studies it was performing for NewMarket if payment wasn't received. Several other VetBridge members received similar communications.

29.     At the time, I did not know how VetPharm learned who VetBridge's members were because that information was confidential under the Agreement. I have since been informed that Mark Ridall told VetPharm that it was VetBridge's responsibility to pay for VetPharm's work (which is not true) and that he and/or Bryan Ridall, in breach of the Agreement's confidentiality provision, not only provided VetPharm with my name, but the names of other VetBridge members. (*See* Declaration of Denni O. Day ("**Day Declaration**"), Plaintiff's Suggestions in Opposition to Defendant's Motion to Transfer ("Opposition"), at Exhibit 1).

30.     Within a few minutes of reading Day's email, I forwarded it to Mark Ridall and asked him how I should respond. After I heard nothing back from Mark Ridall, I sent an email to  Day to schedule a time to talk with her on March 23.

31.     On March 16, 2016, Mark Ridall forwarded me an email from Patrick Niland ("**Niland**"), VetPharm's CFO, which advised that the past due amount for the Prevention study was $224,429.57, and that the past due amount for the Treatment study was $426,153.17. (3/16/2016 Email String, **Exhibit C**). I also informed Mark Ridall that other VetBridge members had informed me that VetPharm had reached out to them, as well, and advised that the VetBridge Board would require a recap of how VetBridge's funds on the project had been spent and would question NewMarket's financial situation. Mark Ridall responded that

> These clowns are owed $370K and it's now 17 days late. You and I have talked about the cost started in October of last year. I meet [sic] with Adent and Midwest in Nov and Dec if you look at the calendar it is now March.

8

We can talk when you get back but let me be clear, this is not my fault she reached out on her own and I will crush her under my foot.

*Id.*

32.     On March 22, 2016, Mark Ridall declined to provide me with permission to speak directly with Day. (See Declaration of Mark Ridall ("Ridall Dec.") [Doc. 9-1] at Exhibit 3). As a result, I informed Day that such permission had been declined and cancelled my call. I also instructed all VetBridge members not to engage in any communications with VetPharm or anyone associated with it.

33.     Although Mark Ridall declined to provide me with permission to speak with VetPharm, thereafter, NewMarket copied me on several emails it subsequently exchanged with VetPharm related to issues concerning NewMarket's nonpayment of VetPharm's invoices.

34.     It is my understanding that VetBridge, its members and its counsel did not have access to VetPharm's studies nor did they have access to any of the data resulting from the studies VetPharm performed. Nor did VetBridge, its members or counsel engage in any communications in any form with VetPharm, Day, Niland, or VetPharm's counsel, regarding the substance or any of the specifics of the studies VetPharm performed or any information about the results of those studies or the data resulting from same.

35.     After Mark Ridall demanded in March and April of 2016, that VetBridge provide it with copies of any communications VetBridge or its members had received from VetPharm, in a series of what I considered threatening emails towards VetBridge, I advised Mark Ridall on April 7, 2016, that all communications in that regard would need to be directed to VetBridge's counsel, Tom Stahl. Mark Ridall emailed me that same day and advised that it was not his intent to threaten VetBridge with legal action. (4/07/2016 Email String, **Exhibit D**).

36.     In mid-April 2016, in connection with its consideration of providing additional funding to NewMarket for the previously requested $806,304.44, VetBridge requested its FDA consultant, Doug Rupp, to visit NewMarket and speak with Dr. Rock to, among other things, obtain information regarding a number of items relating to the Treatment and Prevention studies; determine the timing of and any issues related to submitting the Treatment study to the FDA/CVM for approval; discuss any concerns or

issues that would potentially delay the project or affect its approval by the FDA/CVM (including whether VetPharm's unsolicited, limited communications regarding non-payment of its invoices would have any potential impact on the same); review the VetPharm contract and invoices to determine what was actually owed; and perform an accounting of how VetBridge's $4,000,000 investment had been spent.

37.    Doug Rupp reported back to VetBridge following his visit at NewMarket and advised, among other things, that NewMarket had approximately $1,500,000 in current, unpaid bills and estimated that it would cost an additional $1,000,000 to finish the project, plus an additional $2,000,000 to $2,500,000 to reserve the manufacturing suite, for a total of approximately $4,000,000 to bring the Omeprazole DSI Products to market. Doug Rupp expressed concerns about NewMarket's ability to successfully finish the project due to a lack of funding, and noted that the project had been delayed 6 months thus far. Doug Rupp further confirmed that communications from VetPharm regarding outstanding amounts it claimed it were owed, or who or how those amounts would get paid, would have no negative impact on the regulatory approval process with the FDA/CVM.

38.    Based upon the information Doug Rupp obtained during his visit, several of the members of VetBridge's Board of Managers, including myself, John Adent (AHII) and Jim Cleary (MWI), together with VetBridge's counsel, Tom Stahl, met with Mark Ridall in Denver, Colorado on May 6, 2016 to discuss a number of outstanding questions and issues related to the project, including whether VetBridge would agree to invest the additional funds, as previously requested by NewMarket. (5/06/2016 NewMarket Agenda, **Exhibit E**).

39.    During that meeting, contrary to the Agreement and the information previously provided by NewMarket, Mark Ridall, for the first time, claimed, among other things, (a) that none of VetBridge's money had allegedly gone towards the Treatment study and that VetBridge had acquired no rights in that study or the Omeprazole DSI treatment product; (b) that VetBridge's money[1] had allegedly solely been used for the Prevention study and that VetBridge's only rights under the Agreement related to the

---

[1] Mark Ridall confirmed that VetBridge had satisfied its obligations under the Agreement, but claimed VetBridge only got rights in the Prevention study and product, not the Treatment study and product; though he later acknowledged that VetBridge acquired the rights to both, as indicated below.

prevention product; (c) that NewMarket had purportedly transferred an 80% ownership interest in NewMarket to Aboris Animal Health, LLC ("Aboris"), a Delaware limited liability company; (d) that NewMarket had purportedly assigned its right to manufacture the Omeprazole DSI Products to Aboris; (e) that NewMarket had purportedly transferred its IP/Patent Rights related to the Omeprazole DSI Products to an unnamed, overseas company for "tax purposes"; (f) that VetPharm's invoices as of April 7, 2016 had been paid (though he never answered why VetPharm was still claiming that additional amounts were owed); and (g) that Aboris had recently put $2,000,000 into NewMarket, which was going to be used to pay VetPharm (though he didn't say when that would be done). Mark Ridall further advised that NewMarket was going to pay the $4,000,000 necessary to hold the production line for NewMarket's products and that the Treatment study had had "fantastic results" (though he indicated additional work needed to be finalized before going to the FDA and was unable to provide a date when the Omeprazole DSI Product could actually be manufactured and available for sale by VetBridge). At the conclusion of that meeting, Mark Ridall was specifically informed that VetBridge had met its funding obligation and that it was highly unlikely that VetBridge would agree to provide additional funding.

40.     Unbeknownst to VetBridge at the time of this meeting, and although Mark Ridall assured us that VetPharm's invoices would be taken care of, I subsequently learned that Tom Overbay was in communication with Day and Niland (of VetPharm) following our meeting, and that, contrary to the position we communicated to Mark Ridall at our meeting, assured her that "the investor discussion is still going on," and that it would likely be "mid-week before a consensus is reached." (5/09/2016 Email String, **Exhibit F**). It is my understanding that VetPharm's counsel, Michael McConville, with McConville Considine Cooman & Morin (located in Rochester, New York), subsequently asked our counsel, Tom Stahl, if he could provide anything positive that Day could tell her investigators. I understand that Tom Stahl's only response was that:

> I cannot add anything positive from my group. However, I do not represent the owners or affiliates of New Market. I do not know whether or not that group can provide resources to satisfy you client. Just because my group cannot add anything positive does not speak to New Market, its owners or affiliates.

*Id.*

41.     Following that meeting, and based upon our review of the financial information NewMarket provided Doug Rupp following his visit, it was determined that, contrary to the Agreement's restrictions and limitations on NewMarket's expenditure of the funds paid by VetBridge, as well as the representations made by NewMarket in its invoices to VetBridge, NewMarket, among other things, had used VetBridge's funds to pay for salaries, wages, payroll taxes and other administrative and overhead expenses in an amount in excess of $1,000,000, and that NewMarket, pursuant to the invoices it submitted to VetBridge, had overcharged VetBridge by approximately $1,612,070.15 from what it actually paid the vendors and other third parties, as reflected on such invoices. This information was reported to Mark Ridall and Tom Overbay in an email dated May 17, 2016, which enumerated the overcharges between what NewMarket had paid various vendors versus what it had charged VetBridge. (5/17/2016 Email, **Exhibit G**). Although VetBridge requested a detailed audit of NewMarket's invoices to VetBridge, as well as all of the underlying expenses and invoices reflected therein, NewMarket has not provided VetBridge or Doug Rupp with copies of the same. Moreover, Bryan Ridall informed me that the underlying invoices from NewMarket's vendors would not match up with the amounts charged to VetBridge; although he did not explain why that was the case.

42.     Mark Ridall thereafter provided VetBridge with his letter dated September 6, 2016 (Ridall Dec. [Doc. 9-1] at Exhibit 1). According to that letter, Mark Ridall acknowledged that, as part of the Agreement, VetBridge received rights to both the Treatment and Prevention Omeprazole DSI Products, as well as that it had satisfied its funding obligation thereunder. In addition, he provided VetBridge with an update regarding, among other things, the status of the project, submissions to the FDA and the reasons for various increased costs related to the project, including the amounts due VetPharm. Mark Ridall further agreed going forward, that Bryan Ridall would serve as the point of contact for both myself and our FDA consultant, Doug Rupp, for the review of books and records, and agreed to have Dr. Rock meet with myself and other board members to provide us with an "update on the technical and scientific findings regarding performance of the omeprazole in the clinical studies and to update VetBridge on the regulatory status of the submissions." *Id.*

43.     Thereafter, on October 20, 2016, Mark Ridall, Tom Overbay, Matt Pargament and Dr. Alan Graham met with Tom Stahl and me at Lathrop's Kansas City, Missouri office. At that meeting we were advised that Matt Pargament and Dr. Alan Graham were "investors" in both NewMarket and Aboris; although Dr. Alan Graham had never been previously identified as a NewMarket member. During that meeting, after reporting to us what he claimed was the "treatment field trial effective rate" and that the treatment product should be approved by the FDA and ready to be sold no later than the 3rd or 4th Quarter of 2017, in an apparent turnabout from his September 6, 2016 letter, Mark Ridall presented us with what he claimed were VetBridge's "options" for moving forward with the project; all of which sought to substantially change our Agreement and required VetBridge to put in additional funds (in the minimal sum of $6,000,000 to complete the Treatment and Prevention studies and pay for validation batches— which were NewMarket's obligations under the Agreement—up to a maximum sum of $25,000,000 to get the exclusive distribution rights for both the Omeprazole DSI Treatment and Prevention products, as well as four or five other products purportedly being worked on (and which VetBridge suspects may have improperly been funded with some of VetBridge's money), or to simply develop more products to sell to the big pharmaceutical companies.

44.     Mark Ridall thereafter sent me a letter dated November 15, 2016, wherein he sought to impose yet additional financial obligations on VetBridge that were contrary to the terms of the Agreement, including that VetBridge agree to fund an additional $1,500,000 for registration of the Prevention product; that VetBridge assume responsibility for purchasing the initial validation batches of $1.2 million tablets, at a forecasted cost of $5,100,000 (or $4.25 per tablet; an increase of $1.70/tablet over the originally agreed upon transfer price), and that VetBridge post a letter of credit in favor of NewMarket to cover 20% of the first 18 months of production, to be posted before the validation batches required by the FDA were produced.

45.     The following day, November 16, 2016, Tom Overbay, acting on behalf of NewMarket (and Mark Ridall) sent me yet another proposal that, while committing to lower the transfer price of the tablets, required VetBridge to:

     a.    Fund the balance of the Prevention study;

     b.    Fund the registration of the Omeprazole DSI product for horses in the EU;

     c.    Fund 2 additional product development programs (1 antibiotic and 1 anti-inflammatory), which he indicated would include NewMarket's direct out of pocket costs, as well as the salaries of NewMarket's employees, proportional to their involvement in the projects, and a management fee as a percentage of expenses, estimated at a total cost of $9-11,000,000 per drug.

46.    On December 2, 2016, as previously agreed by Mark Ridall, Dr. Rock and Tom Overbay met with members of VetBridge's Board of Managers and our counsel, Tom Stahl, in a phone conference conducted from Lathrop's offices in Kansas City, Missouri. During that meeting, Dr. Rock and Tom Overbay provided an update on the Omeprazole DSI Products, including, among other things, the status of the FDA filings and future expenses needed to complete the Prevention Omeprazole DSI product, as well as descriptions of the requirements needed for FDA/CVM approval, including the Target Animal Safety, Filed Clinical Efficacy, Human Food Safety, CMC, Environmental Impact, All Other Information, Labeling and Freedom of Information.

47.    Thereafter, in an effort to move the project forward, VetBridge and NewMarket agreed to discuss a proposal to jointly engage a broker to look at the potential of finding a buyer for the Omeprazole DSI Products. Tom Overbay met with Tom Stahl and me at Tom Stahl's offices to discuss the same and we engaged in negotiations with NewMarket (through Mark Ridall and Tom Overbay) in an attempt to agree on the specific metrics for each company.

48.    VetBridge never agreed or consented to NewMarket's purported transfer of any membership interest to Aboris or any other person or entity, nor did it ever consent to NewMarket transferring any of its assets or agreements related to its Omeprazole DSI Products to Aboris, including, but not limited to, any contract rights, manufacturing rights and/or IP/Patent Rights relating thereto, which, to VetBridge's knowledge constitute all or substantially all of NewMarket's assets relating to the Agreement.

49.    Despite that, in late February 2017, I received a copy of the below screenshot, which showed that Aboris was now claiming ownership of NewMarket's "Omeprazole DSI for Equines":



50.     Thereafter, on April 4, 2017, contrary to my discussions with Tom Overbay and Mark Ridall regarding our companies jointly retaining a broker, Tom Overbay informed me that "NewMarket has complet[ed] the engagement of AgriCapital (Doug Sterkel) as the broker for the omeprazole product(s) on a global basis."

51.     VetBridge's counsel, Tom Stahl, subsequently sent a letter to Mark Ridall and Tom Overbay regarding Tom Overbay's April 4 communication and advised that NewMarket had no right to engage a broker or sell any rights that included VetBridge's rights within the U.S. without VetBridge's consent, and that VetBridge did not engage and would not be bound by any agreements entered into between NewMarket and AgriCapital (Doug Sterkel). (4/20/2017 Letter, **Exhibit H**).

52.     In June 2017, I was informed that NewMarket had filed suit against VetPharm in federal court in New Jersey in an effort to get VetPharm to release the final test data to NewMarket, but that NewMarket had lost its attempt to obtain the data, and that NewMarket was ordered to arbitrate its claims against VetPharm.

53.     In August 2017, I had a conference call with Mark Ridall and Tom Overbay for an update on the progress of the Omeprazole DSI project. After reporting a number of problems with the project, as well as the status of the arbitration with VetPharm (which Mark Ridall indicated was moving slowly and could take up to two years), Mark Ridall confirmed that NewMarket had retained Doug Sterkel of AgriCapital, but advised that it did so solely to evaluate other companies' interest in buying the Omeprazole DSI Products. He also advised, based on the feedback he had claimed to have received to date, that the product was worth considerably less than what he had expected.

54.     Following Mark Ridall's update, I informed him that it was VetBridge's expectation that NewMarket would honor its Agreement with VetBridge to supply a finished FDA approved Omeprazole DSI Product that could be sold for both treatment and prevention in the U.S. equine market or sold to another company, depending on what VetBridge felt would be in its best interest. In response, Mark Ridall stated that from a "business perspective" he "did not give a F*** what [I] or VetBridge wanted," as he claimed he had allegedly invested over $6 million of his own money and that "[he] could care less if [he] ever supplies or sells product to [VetBridge]." He then hung up the phone on Tom Overbay and me. Tom Overbay and I both expressed our shock at Mark Ridall's reaction. Tom Overbay confirmed that my expectations were in line with VetBridge's Agreement and he informed me that he would have done exactly the same thing if our roles had been reversed. I then requested that NewMarket provide a project update that could be shared with VetBridge's Board of Managers, and was advised that NewMarket's lawyers would have to write it.

55.     On January 8, 2018, I emailed Mark Ridall and Tom Overbay requesting that NewMarket provide me with an update on the status of the Omeprazole DSI project with VetBridge as of the 2017 year end, consistent with NewMarket's agreement to provide VetBridge with quarterly updates.

56.     Mark Ridall called me in response to that request that same day. During that call Mark Ridall was very adversarial, threatened to sue VetBridge several times, claimed that VetPharm had allegedly "withdrawn" from the arbitration between it and VetPharm and that he had invested $10 million into the project. He stated that the total account with VetPharm was now $1.7 million and that he wanted

VetBridge to "pony it up"; though VetBridge had already satisfied its funding obligations. He also stated that he had spoken with at least two pharmaceutical companies, including Dechra Pharmaceuticals, that the Omeprazole DSI Product was worth $100 million to a big pharmaceutical company and that he wanted to "renegotiate" our Agreement. At no time during that call did Mark Ridall or Tom Overbay ever disclose that NewMarket had actually negotiated or entered into a formal letter of intent with Dechra Pharmaceuticals PLC ("Dechra"), a large international pharmaceutical company based in the United Kingdom, with its U.S. operations based out of Overland Park, Kansas.

57.     On June 4, 2018, acting on behalf of VetBridge, I sent a letter to Mark Ridall, at NewMarket's offices, both by regular and certified mail. Because VetBridge had received no communication from NewMarket regarding the status of the project since my call with Mark Ridall on January 8, 2018 (and VetBridge believed that NewMarket had breached its obligations under the Agreement in numerous respects), I requested that NewMarket provide us with information that demonstrated it could obtain FDA approval and the timing of when the Omeprazole DSI Products would be made available to VetBridge to sell, as well as that it provide confirmation that (i) NewMarket had not granted any security interests in any of the IP/Patent Rights necessary to manufacture the Omeprazole DSI Products (as prohibited by ¶10(f) of the Agreement); (ii) there had been "no change of control" with regard to NewMarket (as defined in in ¶13(v) of the Agreement); and (iii) NewMarket had not "assigned, subcontracted, delegated or otherwise transferred the Agreement or any of its rights or obligations (as prohibited by ¶15(b) of the Agreement), among other things. (A true and correct copy of that letter is attached hereto as **Exhibit I**).

58.     Because no response to that letter was received, on June 22, 2018, VetBridge's attorney, Tom Stahl, sent a demand letter to NewMarket, to the attention of Mark Ridall, by Federal Express, and advised that absent a response, VetBridge "would have no option but to pursue and exercise all of its rights in court of law." (**Exhibit J**). No response to that letter was received.

59.     Having received no communication or response from NewMarket or Mark Ridall, VetBridge thereafter filed this action in the Circuit Court of Buchanan County, Missouri, Case No. 18BU-

CV03640, on August 29, 2018. (Verified Petition for Damages, Specific Performance & Injunctive Relief ("Verified Petition") [Doc. 1 at 1-22]). The Honorable Melissa Lawyer, Circuit Court Judge, entered a Temporary Restraining Order ("TRO") against NewMarket on September 5, 2018 at 9:19 a.m. (TRO [Doc. 1 at 39-45]) and, at the scheduled preliminary injunction hearing on September 14, 2018, with the stipulation of NewMarket's counsel, Robert Pollaro, entered an Amended TRO. (Amended TRO [Doc. 1 at 63-73]).

60.     Late in the evening on September 5, 2018, while reviewing an annual report for Dechra, I noted a footnote on page 128 of Dechra's annual report for the year ended June 30, 2018, which stated that "Included within the research and development expenditure is £0.25 million to secure worldwide rights for an equine gastro intestinal formulation from NewMarket Pharmaceuticals LLC, which we [Dechra] plan to develop to registration through our R&D team." (**Exhibit K**).

61.     I subsequently learned that NewMarket, without VetBridge's knowledge or consent, on or about November 8, 2017, entered into a written Letter of Intent ("LOI") with Dechra "in respect [of] reaching an agreement [for] the grant of an exclusive, worldwide licence [including the U.S.] from NewMarket to Dechra to make, use, market, sell, distribute, import and export omeprazole rapid dissolve tablets in the veterinary market," and received $250,000 from Dechra in connection therewith. It is my understanding that Dechra's obligation to enter into a license agreement with NewMarket (for which it agreed to pay additional funds) is contingent upon completion of its due diligence; but that the due diligence period does not begin to run until after NewMarket makes the data collected by VetPharm available for its review, which it has not yet received. Although Dechra, pursuant to the LOI, purportedly has the right to acquire the worldwide rights to the Omeprazole DSI Products in the veterinary market (which is encompassed by the Field granted to VetBridge under its Agreement), it's my understanding that the rights most important to Dechra under the LOI are to the U.S. market, which is also the precise Territory conveyed to VetBridge under its Agreement. It's my further understanding that, although Dechra was initially approached by Doug Sterkel (of AgriCapital), NewMarket (including Mark Ridall and Tom Overbay) went around AgriCapital and approached Dechra directly to negotiate the LOI.

62.     Doug Sterkel (formerly with AgriCapital), who is located in New York City, confirmed that fact and that NewMarket has not been paid any of the fees it owes AgriCapital under its engagement letter.

63.     All of VetBridge's documents relating to the matters at issue in VetBridge's Verified Petition, now pending before this Court, are located at VetBridge's principal place of business in St. Joseph, Missouri, and at the offices of its counsel in Kansas City, Missouri.

64.     It is my understanding that the following individuals possess knowledge of facts relevant to VetBridge's claims, its damages and/or potential defenses, and may be called to testify at trial:

|  | Witness Name/Affiliation | Location | Subject Matter of Testimony |
|---|---|---|---|
| 1. | Kevin Speltz, VetBridge | St. Joseph, Missouri | All aspects of the Agreement and relationship with NewMarket; VetBridge's performance; NewMarket's lack of performance/inability or refusal to perform; NewMarket's representations regarding the sale/transfer of interests and rights held by VetBridge to third parties; Mark Ridall's representations regarding one or more changes of control; transfers of ownership and other rights to Aboris; representations by Mark Ridall, Tom Overbay and Dr. Rock regarding the foregoing; VetBridge's damages; NewMarket's engagement of Doug Sterkel (AgriCapital) and Dechra LOI; unsolicited, limited communications from VetPharm regarding unpaid invoices |
| 2. | Brandon McKibbon, former CFO, Clipper | Atchison, Kansas | VetBridge's fulfillment of its funding obligation to NewMarket; VetBridge's damages |
| 3. | Tom Stahl, Lathrop | Kansas City, Missouri | Agreement and relationship with NewMarket; VetBridge's performance; NewMarket's lack of performance/inability or refusal to perform; NewMarket's representations regarding the |

| | Witness Name/Affiliation | Location | Subject Matter of Testimony |
|---|---|---|---|
| | | | sale/transfer of interests and rights held by VetBridge to third parties; Mark Ridall's representations regarding one or more changes of control; transfers of ownership and other rights to Aboris; representations by Mark Ridall, Tom Overbay and Dr. Rock regarding the foregoing; unsolicited, limited communications from VetPharm's former counsel regarding unpaid invoices and limited response that VetBridge did not agree to fund |
| 4. | Tom Overbay, DVM, Expedite Animal Health, consultant and former employee of NewMarket | Louisburg, Kansas | All aspects of the Agreement and relationship with NewMarket; VetBridge's performance; NewMarket's lack of performance/inability or refusal to perform; NewMarket's sale/transfer of interests and rights held by VetBridge to third parties; Mark Ridall' representations regarding one or more changes of control; ownership of NewMarket, Aboris and rights conveyed to Aboris; representations by Mark Ridall, Tom Overbay and Dr. Rock regarding the foregoing; NewMarket's engagement of Doug Sterkel (AgriCapital) and negotiation/execution of LOI with Dechra |
| 5. | Dr. Dave Rock, Vice President of Research & Development for NewMarket | California, Missouri | Co-inventor of NewMarket's IP/Patent Rights; NewMarket's efforts to obtain FDA/CVM approval; NewMarket's lack of performance/inability or refusal to perform; one or more changes of control of NewMarket; ownership of NewMarket, Aboris and rights conveyed to Aboris; representations by Mark Ridall, Tom Overbay and Dr. Rock regarding the foregoing |

| | Witness Name/Affiliation | Location | Subject Matter of Testimony |
|---|---|---|---|
| 6. | Sandra Rock, former bookkeep for NewMarket | California, Missouri | Misuse of VetBridge's funds by NewMarket |
| 7. | Doug Rupp, FDA Consultant to VetBridge | Wilmington, NC | Monitored and audited NewMarket performance and FDA approval process; NewMarket's lack of performance/inability or refusal to perform; misuse of VetBridge's funds; NewMarket's sale/transfer of interests and rights held by VetBridge to third parties; Aboris and rights conveyed to Aboris representations by Mark Ridall, Tom Overbay and Dr. Rock regarding the foregoing; lack of impact or effect on FDA/CVM approval process of limited communications from |
| 8. | Guy Flickinger, President of Midwest Vet | Lakeville, Minnesota | Agreement and relationship with NewMarket; VetBridge's performance; NewMarket's lack of performance/inability or refusal to perform; representations by Mark Ridall, Tom Overbay and Dr. Rock regarding the foregoing; unsolicited, limited communications from VetPharm regarding unpaid invoices and limited response that VetBridge would not fund |
| 9. | James Cleary, formerly President of MWI | Boise, Idaho | Agreement and relationship with NewMarket; VetBridge's performance; NewMarket's lack of performance/inability or refusal to perform; NewMarket's representations regarding the sale/transfer of interests and rights held by VetBridge to third parties; Mark Ridall's representations regarding one or more changes of control; transfers of ownership and other rights to Aboris; representations by Mark Ridall, Tom Overbay and Dr. Rock regarding the foregoing |

| | Witness Name/Affiliation | Location | Subject Matter of Testimony |
|---|---|---|---|
| 10. | John Adent, formerly President and CEO, AHII | Lansing, Michigan | Agreement and relationship with NewMarket; VetBridge's performance; NewMarket's lack of performance/inability or refusal to perform; NewMarket's representations regarding the sale/transfer of interests and rights held by VetBridge to third parties; Mark Ridall's representations regarding one or more changes of control; transfers of ownership and other rights to Aboris; representations by Mark Ridall, Tom Overbay and Dr. Rock regarding the foregoing |
| 11. | Dave Wagley, formerly CFO AHII (retired) | Fort Collins, Colorado | Agreement and relationship with NewMarket; VetBridge's performance; NewMarket's lack of performance/inability or refusal to perform |
| 12. | Mary Pat Thompson, formerly Sr. Vice President of Finance of MWI (retired) | Boise, Idaho | Agreement and relationship with NewMarket; VetBridge's performance; NewMarket's lack of performance/inability or refusal to perform; representations by Mark Ridall, Tom Overbay and Dr. Rock regarding the foregoing |
| 13. | George Henriques, Chief Commercial Officer, Patterson Animal Health | Denver, Colorado | Agreement and relationship with NewMarket; VetBridge's performance; NewMarket's lack of performance/inability or refusal to perform; representations by Mark Ridall, Tom Overbay and Dr. Rock regarding the foregoing |
| 14. | Don Louchios, President of Dana4 | Laguna Niguel, California | Agreement and relationship with NewMarket; VetBridge's performance; NewMarket's lack of performance/inability or refusal to perform; representations by Mark Ridall, Tom Overbay and Dr. Rock regarding the foregoing |
| 15. | Marv Jahde, President of The Solutions Group, | Overland Park, Kansas | Marketing consultant to VetBridge to assist in market research, forecasting and sales projections |

| | Witness Name/Affiliation | Location | Subject Matter of Testimony |
|---|---|---|---|
| | LLC, (OP, KS) | | and developing marketing campaign for when FDA approval obtained; damages |
| 16. | Clark Weaver, formerly Equine Sales Manager at MWI | Phoenix, Arizona | Assisted with due diligence an market research for VetBridge and worked with Marv Jahde in forecasting and sales projections; damages |
| 17. | Ian Page, CEO, Dechra Pharmaceuticals, PLC | United Kingdom | NewMarket's engagement of Doug Sterkel (AgriCapital) and contact with Dechra; negotiation/execution/performance of LOI with Dechra and rights proposed to be conveyed, including rights held by VetBridge; NewMarket's failure to disclose VetBridge's Agreement and rights |
| 18. | Susan Longhofer, Group Director, Business Development & Regulatory Affairs, Dechra pharmaceuticals, PLC | United Kingdom | NewMarket's engagement of Doug Sterkel (AgriCapital) and contact with Dechra; negotiation/execution/performance of LOI with Dechra and rights proposed to be conveyed, including rights held by VetBridge; NewMarket's failure to disclose VetBridge's Agreement and rights |
| 19. | Mike Eldred, President of N. Am. Operations, Dechra Veterinary Products, LLC | Overland Park, Kansas | NewMarket's engagement of Doug Sterkel (AgriCapital) and contact with Dechra; negotiation/execution/performance of LOI with Dechra and rights proposed to be conveyed, including rights held by VetBridge; NewMarket's failure to disclose VetBridge's Agreement and rights |
| 20. | Mark Ridall, President of NewMarket | Pennington, New Jersey | All aspects of the Agreement and relationship with NewMarket; VetBridge's performance; NewMarket's lack of performance/inability or refusal to perform; NewMarket's |

| | Witness Name/Affiliation | Location | Subject Matter of Testimony |
|---|---|---|---|
| | | | sale/transfer of interests and rights held by VetBridge to third parties; Mark Ridall' representations regarding one or more changes of control; ownership of NewMarket, Aboris and rights conveyed to Aboris; representations by Mark Ridall, Tom Overbay and Dr. Rock regarding the foregoing; NewMarket's engagement of Doug Sterkel (AgriCapital) and negotiation/execution of LOI with Dechra |
| 21. | Bryan Ridall, formerly employed by NewMarket | Philadelphia, Pennsylvania | Agreement and relationship with NewMarket; VetBridge's performance; NewMarket's lack of performance/inability or refusal to perform; NewMarket's invoicing to VetBridge; NewMarket's misuse of VetBridge's funds; and ownership of NewMarket, Aboris and rights conveyed to Aboris |
| 22. | Doug Sterkel | New York, New York | NewMarket's engagement of Doug Sterkel (AgriCapital) and NewMarket's representations that it could convey US rights "free and clear" and failure to disclose VetBridge's Agreement and rights |
| 23. | Denni O. Day, President VetPharm | Rochester, New York | Mark Ridall's representations to VetPharm that VetBridge was responsible to pay VetPharm's invoices and providing VetPharm with Kevin Speltz's name, along with names of VetBridge's members, contrary to agreement with VetBridge that such information was confidential; VetPharm's unsolicited, limited communications to Kevin Speltz, Guy Flickinger and others regarding VetPharm's unpaid invoices |
| 24. | Patrick Niland, CFO, | Rochester, New York | Mark Ridall's representations to VetPharm that VetBridge was |

| | Witness Name/Affiliation | Location | Subject Matter of Testimony |
|---|---|---|---|
| | VetPharm | | responsible to pay VetPharm's invoices and providing VetPharm with Kevin Speltz's name, along with names of VetBridge's members, contrary to agreement with VetBridge that such information was confidential; VetPharm's unsolicited, limited communications to Kevin Speltz, Guy Flickinger and others regarding VetPharm's unpaid invoices |
| 25. | Michael McConville, McConville, Considine, Cooman & Morin, PC | Rochester, New York | VetPharm's counsel's unsolicited, limited communications to Tom Stahl regarding VetPharm's invoices and Tom Stahl's limited response that VetBridge did not agree to fund |

65.     Based upon where each of the foregoing individuals are located, I highlighted in light blue those witnesses for whom I believe a trial would be more convenient in Kansas City, Missouri (a total of 8 witnesses); yellow for those for whom I believe a trial in Kansas City, Missouri would be more convenient than in Trenton, New Jersey (a total of 7 witnesses); light green for those for whom I believe a trial would be equally inconvenient, whether the trial was to take place in Kansas City, Missouri or Trenton, New Jersey (a total of 4 witnesses), and no highlighting for those potential witnesses for whom I believe a trial would be more convenient in Trenton, New Jersey (a total of 6 potential witnesses).

66.     VetBridge does not own any real estate, bank accounts or other property in New Jersey, and does not transact any business there. Until VetBridge is able to actually sell the Omeprazole DSI Products which are the subject of its Agreement, VetBridge has no revenue source and is totally reliant upon capital contributions from its members.

67.     VetBridge has no affiliation or relationship, contractual or otherwise, with VetPharm and VetBridge's interests, which arise under an entirely separate contract with NewMarket (*i.e.*, the Agreement), are not in any way aligned with those of VetPharm.

68.     Based upon my personal observations and interactions with Mark Ridall, it is my understanding and opinion that he is a sophisticated businessman. During the time I have known him since late 2013, he has told me that his has extensive experience in the racehorse industry, has owned and bred racehorses, has owned and operated several companies, in addition to NewMarket, and has extensive contacts with the top pharmaceutical companies and executives in New Jersey. Additionally, I have been on his personal jet, which he acquired after the Agreement was entered, that he uses for travel.

I make this declaration under penalty of perjury under the laws of the United States and the laws of the State of Missouri.

Dated: November 6, 2018

Kevin Speltz

# EXHIBIT A

# (Requested To Be Filed Under Seal)

**EXHIBIT A (Speltz Decl.)**



# INVOICE

Attention:          Kevin Speltz
                       President

VetBridge Product Development Subsidiary I, LLC

**102-016-0210**
[mridall@newmarketpharma.com](mailto:mridall@newmarketpharma.com)

1302 South 59th Street
St. Joseph, MO 64507
Date: 02/10/2016

**4 Pitcairn Ave., Suite 4**
**Trenton, NJ 08628**

Title: Omeprazole DSI Project Invoice
Description: Q1 2016
Invoice Number: 102-016-0210
Terms: Net 30 days

Remit Payment To:     NewMarket Pharmaceuticals LLC
                             4 Pitcairn Ave., Suite 4, Trenton, NJ 08628

Electronic Wire/ACH Instructions:
Bank of America
ABA #: 026009593
Account #: 381018963117
FBO: NewMarket Pharmaceuticals LLC

<u>NOTE:</u>

This invoice is to cover budget overruns attributable to changes in position by the CVM after the execution of our Agreement in June of 2014, which doubled to number of studies to be performed.

| ITEM DESCRIPTION | COMPANY NAME | Q1 2016 |
|---|---|---|
| Efficacy Section: Treatment Study Milestone Payments | VetPharm Inc. | $ 345,012.31 |
| Efficacy Section: Prevention Study Milestone Payments | VetPharm Inc. | $ 89,132.92 |
| Efficacy Section: Treatment Study Pass-Throughs | VetPharm Inc. | $ 173,800.21 |
| Efficacy Section: Prevention Study Pass-Throughs | VetPharm Inc. | $ 84,063.00 |
| Safety Section: Milestone Payment | VetPharm Inc. | $ 74,296.00 |
| Safey Section: Study Monitoring | RDR Consulting LLC | $ 20,000.00 |
| Regulatory: Quality Assurance Consulting | LG Consulting Services | $ 10,000.00 |
| Regulatory: CMC Section Submission Consulting | Hughes Consulting | $ 10,000.00 |
| | Omeprazole DSI Billing for Q1 2016: | $ 806,304.44 |

Case 5:18-cv-06147-BCW    Document 26-2    Filed 11/07/18    Page 28 of 49

**EXHIBIT B (Speltz Decl.)**

| From: | Mark Ridall [mridall@newmarketpharma.com] |
|---|---|
| Sent: | 3/16/2016 9:15:31 PM |
| To: | Kevin Speltz [kspeltz@clipperdist.net] |
| Subject: | Re: Monday |

These clowns are owed $370K and it's now 17 days late. You and I have talked about the cost started in October of last year. I meet with Adent and Midwest in Nov and Dec if you look at the calendar it is now March.

We can talk when you get back but let me be clear, this is not my fault she reached out on her own and I will crush her under my foot.

Best regards,

**Mark Ridall**
Chief Executive Officer

NewMarket Pharmaceuticals LLC
4 Pitcairn Avenue, Suite 4
Trenton, New Jersey 08628
t: 609.252.9600 ext. 101
mridall@newmarketpharma.com
www.newmarketpharma.com

***Important Warning:***

*This message is intended for the use of the person or entity to which it is addressed and may contain information that is privileged and confidential, the disclosure of which is governed by applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this information is STRICTLY PROHIBITED. If you have received this message by error, please notify us immediately and destroy the related message. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Unauthorized re-disclosure or failure to maintain confidentiality could subject you to penalties described in federal and state law.*

On Mar 16, 2016, at 5:02 PM, Kevin Speltz <KSpeltz@clipperdist.net> wrote:

Yes the numbers are different than the email I received.
As soon as I got to the Bahamas yesterday and received this email I forwarded it to you and asked for advice or suggestions how to respond.
When I heard nothing back I sent VetPharm an email asking for more information and told them that  I was out of the country and could we address this next week?
VetPharm replied back that they would hold off doing something until we had a chance to talk next week instead of terminating the studies.
I was tied up entertaining  people until midnight last night and started early am again today and this is my first break.
Today I have had voice mails  from and text from VB members that VetPharm had reached out to them.  The VB Board will now require a recap of what you have spent on this project with VB funds and will question your financial situation.
This is now a cluster and I am stuck in the middle.  I guess that makes two of us that are put out by this mess.

Kevin Speltz
President
Clipper Distributing Company
1302 South 59 th Street
St Joseph. MO. 64507
Sent by I Phone

On Mar 16, 2016, at 1:57 PM, Mark Ridall <mridall@newmarketpharma.com> wrote:

Kevin-

Please not the email below. The numbers are very different the the email you received yesterday.

By the way I was a little put off you have not reached out to me about this.

Best regards,

**Mark Ridall**
Chief Executive Officer

NewMarket Pharmaceuticals LLC
4 Pitcairn Avenue, Suite 4
Trenton, New Jersey 08628
t: 609.252.9600 ext. 101
mridall@newmarketpharma.com
www.newmarketpharma.com

*Important Warning:*

*This message is intended for the use of the person or entity to which it is addressed and may contain information that is privileged and confidential, the disclosure of which is governed by applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this information is STRICTLY PROHIBITED. If you have received this message by error, please notify us immediately and destroy the related message. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Unauthorized re-disclosure or failure to maintain confidentiality could subject you to penalties described in federal and state law.*

Begin forwarded message:

**From:** Patrick Niland <pniland@vetpharm.com>
**Subject: Monday**
**Date:** March 12, 2016 at 9:37:03 AM EST
**To:** Bryan Ridall <bryanr@newmarketpharma.com>
**Cc:** Denni Day <dday@vetpharm.com>, "mridall@newmarketpharma.com" <mridall@newmarketpharma.com>

Bryan,

I was relieved by your email regarding payment on Monday. That is great! The investigators have worked so hard and done such a good job, so they really deserve to be paid.

Just to give you an update, as of Monday, the past due amount for the Prevention study is $224,429.57 and the past due amount for the Treatment study is $426,153.17, for a total past due amount of $650,582.74. It will be wonderful to get this little problem behind us, so we can finish the studies and you can get regulatory approval and start making money!

Have a nice weekend.

*Pat*

Patrick B. Niland
Executive Vice President
Chief Financial Officer
VetPharm, Inc.
349 West Commercial Street
Suite 2200
East Rochester, NY 14445-2421
(585) 249-1090 ext. 204
(585) 249-1091 fax
(585) 409-0773 cell
pniland@vetpharm.com
Website: www.vetpharm.com

**Data Delivered. Integrity Found.**

CONFIDENTIALITY NOTICE. This e-mail contains confidential information, belonging to the sender, which is legally privileged. This information is intended solely for the use of the individual(s) or entity(ies) named above. If you are not the intended recipient, you hereby are notified that any disclosure, reproduction, distribution, or other unauthorized use of the contents of this e-mail transmission, for any purpose whatsoever, is strictly prohibited. If you have received this e-mail transmission in error, please notify the sender immediately at the above e-mail address to arrange for the return or destruction of the email transmission and its contents and/or attachments.

| | |
|---|---|
| **From:** | Mark Ridall <mridall@newmarketpharma.com> |
| **Sent:** | Thursday, April 07, 2016 2:55 PM |
| **To:** | Kevin Speltz |
| **Cc:** | Stahl, Thomas |
| **Subject:** | Re: Official Request for Information |
| | |
| **Categories:** | Orange Category |

Kevin-

We should talk. We are partners in this together and involving lawyers is not the way to move the product forward.

I gather from your email and direction to address all communication to Tom Stahl that you misunderstood my email to mean that legal action will be forthcoming from NewMarket. That was not my intent.

NewMarket is moving ahead with the CMC section, pK and safety study submissions; however, the rate limiting factor to approval will be how quickly we can complete the field clinical study. Without knowing what conversations, if any, were had between VetPharm and VetBridge representatives, and the content of those potential conversations, NewMarket cannot move forward with the field clinical study at VetPharm. This puts our registration on hold indefinitely, and is what I was alluding to with my last comment.

As you are aware, the first trial has completed the in-life phase but we cannot and will not move forward with compiling data and submitting the dossier without evaluating any potential harm to the integrity of this data. I do not know if any VetBridge members or VetPharm acted improperly, and my hope is that they did not, but without knowing the content of these communications I cannot evaluate whether this is a threat to the efficacy section of our submission or not.

I want you to understand that NewMarket as the Sponsor of the drug and VetPharm as the CRO conducting the study will be asked questions by the CVM as to who was blinded to the study, who had access to data, and who did the people with access to the data discuss the data with during the study. The CVM can request the details of any and all potential communications of this nature and we need to be prepared to answer these questions. This is why it is important for us to be candid with each other in this matter and why we requested the information in a timely manner.

We are all in this together so this should be a very easy thing to address. If not, it just raises more questions, makes my job more difficult, and delays our time to market. We have a good partnership and I'd like to put this issue behind us so we can move forward together. We both have much more important work to be doing and other products to bring to market together.

Happy to discuss by phone anytime.

Best regards,

**Mark Ridall**
Chief Executive Officer

1

**EXHIBIT D (Speltz Decl.)**

NewMarket Pharmaceuticals LLC
4 Pitcairn Avenue, Suite 4
Trenton, New Jersey 08628
t: 609.252.9600 ext. 101
mridall@newmarketpharma.com
www.newmarketpharma.com

*Important Warning:*

*This message is intended for the use of the person or entity to which it is addressed and may contain information that is privileged and confidential, the disclosure of which is governed by applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this information is STRICTLY PROHIBITED. If you have received this message by error, please notify us immediately and destroy the related message. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Unauthorized re-disclosure or failure to maintain confidentiality could subject you to penalties described in federal and state law.*

On Apr 7, 2016, at 1:55 PM, Kevin Speltz <KSpeltz@clipperdist.net> wrote:

Mark, after reading your email it appears that attorneys will soon be involved. All further communication on this issue should be directed to our attorney Tom Stahl. Please have your attorney call Tom Stahl at 816-460-5821
Kevin Speltz
President
Clipper Distributing Company, LLC
1302 S 59th Street
St Joseph, MO 64507
816-364-5777 x100
kspeltz@clipperdist.net

**From:** Mark Ridall [mailto:mridall@newmarketpharma.com]
**Sent:** Thursday, April 07, 2016 9:27 AM
**To:** Kevin Speltz
**Subject:** Re: Official Request for Information
Kevin,
Thx for responding, I hope all of the VetBridge members understand the gravity of the situation. We have to have this info today and if it is not a priority for them to respond to you or me it soon will be.
Let me know something today please.
Best regards,
**Mark Ridall**
Chief Executive Officer
NewMarket Pharmaceuticals LLC
4 Pitcairn Avenue, Suite 4
Trenton, New Jersey 08628
t: 609.252.9600 ext. 101
mridall@newmarketpharma.com
www.newmarketpharma.com
*Important Warning:*
*This message is intended for the use of the person or entity to which it is addressed and may contain information that is privileged and confidential, the disclosure of which is governed by applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the*

*intended recipient, you are hereby notified that any dissemination, distribution or copying of this information is STRICTLY PROHIBITED. If you have received this message by error, please notify us immediately and destroy the related message. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Unauthorized re-disclosure or failure to maintain confidentiality could subject you to penalties described in federal and state law.*

On Apr 6, 2016, at 12:00 PM, Kevin Speltz <KSpeltz@clipperdist.net> wrote:

I forwarded your request to the VB members the same day I received it. To date I have not received a response or information from any of the members.

Kevin Speltz
President
Clipper Distributing Company, LLC
1302 S 59th Street
St Joseph, MO 64507
816-364-5777 x100
kspeltz@clipperdist.net

**From:** Mark Ridall [mailto:mridall@newmarketpharma.com]
**Sent:** Tuesday, April 05, 2016 5:05 PM
**To:** Kevin Speltz
**Cc:** Tom Overbay
**Subject:** Re: Official Request for Information

Kevin,

Following up on my email below, please find attached a second request for information related to any possible discussions between VetPharm and VetBridge members.

Thanks,
Mark

**From:** Kevin Speltz <KSpeltz@clipperdist.net>
**Sent:** Tuesday, March 29, 2016 4:16 PM
**To:** Mark Ridall
**Cc:** Tom Overbay
**Subject:** RE: Official Request for Information

Yes I have received this and will forward it to the VB members today.

Kevin Speltz
President
Clipper Distributing Company, LLC
1302 S 59th Street
St Joseph, MO 64507
816-364-5777 x100
kspeltz@clipperdist.net

**From:** Mark Ridall [mailto:mridall@newmarketpharma.com]
**Sent:** Tuesday, March 29, 2016 11:40 AM
**To:** Kevin Speltz
**Cc:** Tom Overbay
**Subject:** Official Request for Information

Dear Kevin,

Pursuant to our telephone conversation yesterday, please find attached our official request for all information related to communication between VetPharm, Inc. and any/all VetBridge members or representatives of member companies. Please confirm receipt of this email and attachment when you can.

Thanks,

Mark

**Mark Ridall**

Chief Executive Officer

NewMarket Pharmaceuticals LLC

4 Pitcairn Avenue, Suite 4

Trenton, New Jersey 08628

t: 609.252.9600 ext. 101

mridall@newmarketpharma.com

www.newmarketpharma.com

*Important Warning:*

*This message is intended for the use of the person or entity to which it is addressed and may contain information that is privileged and confidential, the disclosure of which is governed by applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this information is STRICTLY PROHIBITED. If you have received this message by error, please notify us immediately and destroy the related message. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Unauthorized re-disclosure or failure to maintain confidentiality could subject you to penalties described in federal and state law.*



**Friday May 6th**

**Westin Denver Airport, Lilac Board Room**

**New Market Agenda**

**Objective of the meeting is to provide Vet Bridge with a FDA approved NADA products to sell.**

**Overview of Project:**                                      **Mark Ridall**

Status of field trial for both Treatment and Prevention claims, updated time lines of when both studies will be finished.

Vet Pharm, treatment study data release, unpaid invoices

FDA filing of field trials, safety information, PK data, CMC, full submission.

Catalent Suite update, does New Market have a contract to manufacture and package finished product?

Updated timeline of when a FDA NADA approved product will be available.  Funding requirements needed to complete the project and produce finished product.

Financial Update, recap of how Vet Bridges 4 million has been used for this project.

Other?

**Options to finish the project:**                        **Group Discussion**

**EXHIBIT E (Speltz Decl.)**

| From: | Stahl, Thomas (LG) [TStahl@LATHROPGAGE.COM] |
|---|---|
| Sent: | 5/9/2016 5:01:09 PM |
| To: | 'McConville, Michael F' [mmcconville@mccmlaw.com] |
| Subject: | RE: NewMarket update |

Michael, I cannot add anything positive from my group. However I do not represent owners or affiliates of New Market . I do not know whether or not that group can provide resources to satisfy your client. Just because my group cannot add anything positive does not speak for New Market, its owners or affiliates. Tom

This e-mail (including any attachments) may contain material that (1) is confidential and for the sole use of the intended recipient, and (2) may be protected by the attorney-client privilege, attorney work product doctrine or other legal rules. Any review, reliance or distribution by others or forwarding without express permission is strictly prohibited. If you are not the intended recipient, please contact the sender and delete all copies.

**From:** McConville, Michael F [mailto:mmcconville@mccmlaw.com]
**Sent:** Monday, May 09, 2016 10:15 AM
**To:** Stahl, Thomas
**Subject:** FW: NewMarket update

Tom-please see Denni Day's email below.    Is there anything positive she can tell the investigators?

Michael F. McConville, Esq.

Direct line  (585) 512-3517
Direct Fax (585) 512-3567



25 East Main Street, Suite 500
Rochester, NY 14614
phone: (585) 546-2500   fax: (585) 546-7218
www.mccmlaw.com

The information in this transmittal (including attachments, if any) may be privileged and confidential, and is subject to attorney work product protection. Any review, use, disclosure, distribution or copying of this transmittal is prohibited except on behalf of the intended recipient. If you have received this message in error, please notify me immediately by reply email and destroy all copies of the transmittal. THANK YOU. IRS CIRCULAR 230 Disclosure: Under U.S. Treasury regulations, we are required to inform you that any tax advice contained in this transmittal or any attachment hereto is not intended to be used, and cannot be used, to avoid penalties imposed under the Internal Revenue Code.

**From:** Denni Day [mailto:dday@vetpharm.com]
**Sent:** Saturday, May 07, 2016 9:53 AM
**To:** McConville, Michael F
**Cc:** Patrick Niland
**Subject:** NewMarket update

Mike—Tom Overbay's summary of yesterday's meeting between NewMarket and the investors (see below) leaves me with serious fears.

For more than two months, I have been communicating with each of the study investigators, by phone and email, at least weekly. A common persistent theme in every conversation is their frustration (and, in several

cases, growing anger) at not being paid for the study work they completed in good faith. Since I have run out of excuses, and certainly do not have anything meaningful or encouraging to tell them now, I am afraid that they will quit. That would be a serious set-back to the studies, if not an outright death blow.

It appears to me that everyone has lost sight of just how critical the study investigators are to the success of these two products. People have said that they want to move forward with both studies and that they understand that VetPharm and the study investigators must be paid before any work resumes. But, then, weeks go by with no payments. Instead, the parties spend their time discussing other issues. Resolving those other issues is a big waste of everyone's time if we lose the investigators. They are the central, paramount, essential issue, that must be taken care of—**now**—in order for the studies to resume.

Thanks,
Denni.

**From:** Tom Overbay [mailto:tom.overbay@gmail.com]
**Sent:** Friday, May 06, 2016 7:45 PM
**To:** Patrick Niland <pniland@vetpharm.com>; Denni Day <dday@vetpharm.com>
**Cc:** Bryan Ridall <b.ridall@aborisah.com>; Dave Rock <d.rock@aborisah.com>
**Subject:** RE: Fwd: Update

Denni,

The investor discussion is still going on.

The meeting could have gone better but was not a disaster either. Issue is that investorshave different ideas about what to do and what that might mean to them. No real surprise there.

Good news is that everyone wants to move ahead. Everyone knows what it takes to move aheas. Bad news is that it is likely to be mid-week before consensus is reached.

Hope this is helpful.

Tom

Sent from my Sprint Samsung Galaxy S® 6.

**To:** Mark Ridall[mridall@newmarketpharma.com]; Tom Overbay (tom.overbay@gmail.com)[tom.overbay@gmail.com]
**Cc:** Brandon McKibben[BMcKibben@clipperdist.net]; Tom Stahl (tstahl@lathropgage.com)[tstahl@lathropgage.com]; Kevin Speltz[KSpeltz@clipperdist.net]; Rupp[Rupp8818@twc.com]
**From:** Kevin Speltz
**Sent:** Tue 5/17/2016 8:33:22 PM
**Subject:** Vet Bridge Invoices
New Market Omp expenses from Doug Rupp - ALL2 (2).xlsx

;;;;
Mark
We have reviewed the data that New Market provided Doug Rupp when he visited New Market to audit the Omeprazole expenses invoiced to Vet Bridge.

When we reviewed the information on the Companies New Market has paid , versus what Vet Bridge has been invoiced there is a wide range of discrepancies.

Based on the limited data we have been able to review, it appears that Vet Bridge invoices exceeded expenses by 1.6 million dollars. This was calculated by looking at what New Market paid to each Company, comparing it to what New Market invoiced Vet Bridge. The attached spread sheet has the specifics on each company, all financial information used was provided by New Market. Listed below is a summary of the companies that Vet Bridge was invoiced at a higher amount than what New Market shows as a expense.

| Company | Amount Paid by New Market | Amount charged to Vet Bridge | Dollar Difference |
|---|---|---|---|
| AH Regulatory Solutions, LLC | 750.00 | 5,000.00 | 4,250.00 |
| Catalent Pharma Solutions | 1,067,694.44 | 1,768,444.00 | 700,749.56 |
| Expedite, LLC | 244,598.21 | 275,060.86 | 30,462.65 |
| FDA | 70,133.27 | 412,934.96 | 342,801.69 |
| Hughes Consulting | 28,565.00 | 90,070.00 | 61,505.00 |
| LG Consulting Services | 14,244.12 | 28,525.00 | 14,280.88 |
| Schafer Veterinary Company | 15,656.25 | 45,656.25 | 30,000.00 |
| Southwest Bio Labs | 392,821.00 | 652,000.00 | 259,179.00 |
| Travel | 3,985.51 | 30,000.00 | 26,014.49 |
| Steven & Lee | - | 24,127.88 | 24,127.88 |
| Shulklapper & Assoc | - | 15,000.00 | 15,000.00 |
| TBD | - | 50,000.00 | 50,000.00 |
| CSM | - | 53,699.00 | 53,699.00 |
| **Total Overcharged** | | | **1,612,070.15** |

There are some companies that New Market has paid more than what has been invoiced to Vet Bridge. We do not have enough detailed information to determine why some expenses invoiced to Vet Bridge are higher or lower than what New Market paid. We believe it is necessary to do a detailed audit of all invoices associated with New Market and Vet Bridge for this project. We need to look at the dates of each invoice, amount charged, reason for the expense to make sure Vet Bridge has been invoiced correctly.

Please let us know when will be a good time to schedule this audit.

**EXHIBIT G (Speltz Decl.)**

Kevin Speltz
President
Clipper Distributing Company, LLC
1302 S 59th Street
St Joseph, MO 64507
816-364-5777 x100
kspeltz@clipperdist.net

# LATHROP & GAGE LLP

THOMAS H. STAHL
DIRECT LINE: 816.460.5821
EMAIL: TStahl@LathropGage.com
WWW.LATHROPGAGE.COM

2345 GRAND BOULEVARD, SUITE 2200
KANSAS CITY, MISSOURI 64108-2618
PHONE: 816.292.2000
FAX: 816.292.2001

April 20, 2017

**VIA FEDEX PRIORITY OVERNIGHT**

Mark Ridall, CEO
NewMarket Pharmaceuticals LLC
4 Pitcairn Way, Suite 4
Trenton, NJ 08628

| Ref: 559701/T.STAHL/N Date: 20Apr17 | | SHIPPING: | 13.33 |
|---|---|---|---|
| Dep: | Wgt: 0.40 LBS | SPECIAL: | 0.47 |
| | | HANDLING: | 0.00 |
| | DV: 0.00 | TOTAL: | 13.80 |
| Svcs: PRIORITY OVERNIGHT | | | |
| TRCK: 7215 3151 2762 | | | |

Tom Overbay, DVM
Expedite LLC
29449 Ridgeline Drive
Louisburg, KS 66053

| Ref: 559701/T.STAHL/N Date: 20Apr17 | | SHIPPING: | 8.01 |
|---|---|---|---|
| Dep: | Wgt: 0.40 LBS | SPECIAL: | 2.97 |
| | | HANDLING: | 0.00 |
| | DV: 0.00 | TOTAL: | 10.98 |
| Svcs: PRIORITY OVERNIGHT | | | |
| TRCK: 7215 3151 2773 | | | |

Re:     Omeprazole USA Distribution Rights

Dear Mark and Tom:

On March 29, Tom Overbay sent to Kevin Speltz an Omeprazole update. In that update, VetBridge was advised that NewMarket had completed the engagement of AgriCapital (Doug Sterkel) as broker for the Omeprazole Animal Products on a global basis.

Perhaps "global basis" means rights outside of the United States, but if not, then please be advised as follows:

     1.    VetBridge must be directly involved in hiring any broker with regard to the distribution of Omeprazole Animal Products in the United States.

     2.    As VetBridge was not involved in the engagement of AgriCapital, please understand that AgriCapital has not been hired by VetBridge and VetBridge is not bound by any agreements entered into between NewMarket and AgriCaptial.

     3.    Once VetBridge engages a broker, that broker will be directed by Kevin Speltz as to the sale of the rights to distribute Omeprazole Animal Products.

The above formal response does not mean we do not want to meet with the both of you to discuss the sale of distribution rights for Omeprazole Animal Products both inside the

CALIFORNIA       COLORADO       ILLINOIS       KANSAS       MASSACHUSETTS       MISSOURI

27337020v1

Case 5:18-cv-06147-BCW   Document 26-2   Filed 11/07/18   Page 41 of 49

**EXHIBIT H (Speltz Decl.)**

The above formal response does not mean we do not want to meet with the both of you to discuss the sale of distribution rights for Omeprazole Animal Products both inside the United States as well as outside the United States. We also believe that we need to reach an agreement on what each party expects to receive upon the sale prior to any broker bringing in potential purchasers.

Kevin, when directing me to respond to the Omeprazole update, also advised that he would be pleased to meet the both of you in early May to find agreement in how to handle the broker situation as well as decide the issues concerning what each party expects to receive as a result of the broker process. Please check your schedules and let us know of convenient dates and times. I am pleased to offer conference rooms at my law office for these meetings.

Sincerely,

LATHROP & GAGE LLP

By: *Thomas H. Stahl*
Thomas H. Stahl

THS/tlh

Enclosure

cc:   Kevin Speltz (via e-mail)



June 4, 2018

**VIA CERTIFIED MAIL/**
**RETURN RECEIPT REQUESTED**

NewMarket Pharmaceuticals LLC
Attn: Mr. Mark Ridall
4 Pitcairn Avenue
Suite 4
Trenton, New Jersey 08628

Re:    Exclusive Distribution and License Agreement - VetBridge

Dear Mr. Ridall:

As you are aware, NewMarket Pharmaceuticals LLC ("NM") executed an Exclusive Distribution and License Agreement ("Agreement") effective June 27, 2014, with VetBridge Product Development Subsidiary I (NM-OMP), LLC ("Distributor").   Distributor believes NM has breached its obligations.  Therefore, please produce and answer the following:

1.     NM was to manufacture products which are rapidly dissolving formulations of omeprazole, including Omeprazole Direct Systemic Introduction ("DSI") compositions for use in all non-human animals ("Omeprazole Products").  Despite almost four years since the execution of the Agreement, Distributor has not received any Omeprazole Products and does not have any information which supports NM's ability to provide the Omeprazole Products to Distributor. Please provide any and all information in detail which shows (a) that NM can provide FDA approval of Omeprazole Products and (b) the timing the Omeprazole Products will be available for Distributor to sell.

2.     Provide a timeline for NM's representatives to educate and train Distributor's personnel pursuant to paragraph 6(b) of the Agreement.  (All further references to "paragraphs" refer to the Agreement.)

3.     Provide any information concerning NM's active promotion of the Omeprazole Products by advertising and other promotional activities pursuant to paragraph 6(d).

4.     Provide copies of NM's commercial general liability insurance policy in accordance with paragraph 6(e) of the Agreement, including proof of such insurance having been in place since June 27, 2014.

**EXHIBIT I (Speltz Decl.)**

5.     Provide information that you are manufacturing the Omeprazole Products in accordance with all applicable state and local laws pursuant to paragraphs 6(f) and 9(a).

6.     Please state that the Omeprazole Products are free of any security interest lien or encumbrance, conformed to the specifications, do not infringe any other patent, that NM has a valid license to manufacture and sell the Omeprazole Products, all pursuant to paragraph 9(a).

7.     Please provide the most recent contract with Catalent with allows NM to sell the Omeprazole Product using Catalent ZYDIS pursuant to paragraphs 9 and 10.

8.     Pursuant to paragraph 10(d), please provide all agreements from NM collaborators, including all parties whom NM needs in order to manufacture and sell the Omeprazole Products, that allows Distributor without any royalty, cost or other restriction imposed by the collaborators to sell the Omeprazole Products.   Not only should the collaborators' representations and indemnifications be provided to the Distributor, but also must be acceptable to the Distributor.

9.     Please provide pursuant to paragraph 10(d) representations from the collaborators that the sale of the Omeprazole Product does not infringe any U.S. Patent.

10.     Please provide the insurance and certificates which cover Distributor concerning breach of warranty or indemnity pursuant to paragraphs 9, 10(d) and 11 as set forth in paragraph 10(e).

11.     Please affirmatively state that NM has not granted any security interest in any IP assets of NM necessary to manufacture the Omeprazole Products pursuant to paragraph 10(f).

12.     As Distributor is not aware of any Omeprazole Products which NM can currently or in the future supply, NM should indemnify Distributor for its gross negligent and/or wrongful acts or omission by manufacturer which caused the unavailability of the Omeprazole Products.

13.     Please specifically state that there has been no "change of control" pursuant to paragraph 13(v).

14.     Please specifically state that NM has not assigned, subcontracted, delegated or otherwise transferred this Agreement or any of its rights or obligations pursuant to paragraph 15(b).

We respectfully request that you provide answers to this letter within seven (7) days and that you immediately cure all breaches of your obligations as required under the Agreement.

Sincerely yours,


Kevin Speltz
President Vet Bridge Animal Health



**THOMAS H. STAHL**
PARTNER
DIRECT: 816.460.5821

MAIN: 816.292.2000
FAX: 816.292.2001
TSTAHL@LATHROPGAGE.COM
LATHROPGAGE.COM

2345 GRAND BOULEVARD, SUITE 2200
KANSAS CITY, MISSOURI 64108-2618

June 22, 2018

**VIA FEDEX STANDARD OVERNIGHT**

NewMarket Pharmaceuticals LLC
Attn: Mr. Mark Ridall
4 Pitcairn Avenue, Suite 4
Trenton, NJ 08628

Re:     Default

Dear Mr. Ridall:

We have been authorized by VetBridge Product Development Subsidiary (I)(NM-OMP), LLC ("Distributor") to declare that NewMarket Pharmaceuticals LLC ("NM") is in default and has breached the Exclusive Distribution and License Agreement ("Agreement") between the parties which was effective June 27, 2014.

On or about June 4, 2018, a letter was sent by Distributor to NM, a copy of which is attached hereto and incorporated by reference herein, both by Certified Mail and by regular U.S. Mail. Therein, NM was requested to respond to specific paragraphs to show that NM was not currently in default and in breach of said Agreement. NM has failed to do so, leaving Distributor no alternative but to declare that NM has defaulted and is in breach of the Agreement.

Because of NM's failure to respond or make any offer to Distributor to pay for the damages which Distributor has suffered, it would be a useless act for NM and Distributor to mediate in Kansas City in accordance with the Agreement. However, to try to reach some agreement, Distributor will give NM seven (7) days from the date of this letter to make Distributor an offer to pay it an amount to cover all the damages it has suffered and will suffer in the future in return for a release. Failure to do so will leave Distributor no option but to pursue and exercise all of its rights in a court of law.

Sincerely,

Lathrop Gage LLP

By:   _Thomas H. Stahl_

Thomas H. Stahl

THS/tlh
Enclosure
cc:     Kevin Speltz (via e-mail)

29684318v1
**EXHIBIT J (Speltz Decl.)**



June 4, 2018

**VIA CERTIFIED MAIL/**
**RETURN RECEIPT REQUESTED**

NewMarket Pharmaceuticals LLC
Attn: Mr. Mark Ridall
4 Pitcairn Avenue
Suite 4
Trenton, New Jersey 08628

Re:     Exclusive Distribution and License Agreement - VetBridge

Dear Mr. Ridall:

As you are aware, NewMarket Pharmaceuticals LLC ("NM") executed an Exclusive Distribution and License Agreement ("Agreement") effective June 27, 2014, with VetBridge Product Development Subsidiary I (NM-OMP), LLC ("Distributor"). Distributor believes NM has breached its obligations. Therefore, please produce and answer the following:

      1.     NM was to manufacture products which are rapidly dissolving formulations of omeprazole, including Omeprazole Direct Systemic Introduction ("DSI") compositions for use in all non-human animals ("Omeprazole Products"). Despite almost four years since the execution of the Agreement, Distributor has not received any Omeprazole Products and does not have any information which supports NM's ability to provide the Omeprazole Products to Distributor. Please provide any and all information in detail which shows (a) that NM can provide FDA approval of Omeprazole Products and (b) the timing the Omeprazole Products will be available for Distributor to sell.

      2.     Provide a timeline for NM's representatives to educate and train Distributor's personnel pursuant to paragraph 6(b) of the Agreement. (All further references to "paragraphs" refer to the Agreement.)

      3.     Provide any information concerning NM's active promotion of the Omeprazole Products by advertising and other promotional activities pursuant to paragraph 6(d).

      4.     Provide copies of NM's commercial general liability insurance policy in accordance with paragraph 6(e) of the Agreement, including proof of such insurance having been in place since June 27, 2014.

5.   Provide information that you are manufacturing the Omeprazole Products in accordance with all applicable state and local laws pursuant to paragraphs 6(f) and 9(a).

6.   Please state that the Omeprazole Products are free of any security interest lien or encumbrance, conformed to the specifications, do not infringe any other patent, that NM has a valid license to manufacture and sell the Omeprazole Products, all pursuant to paragraph 9(a).

7.   Please provide the most recent contract with Catalent with allows NM to sell the Omeprazole Product using Catalent ZYDIS pursuant to paragraphs 9 and 10.

8.   Pursuant to paragraph 10(d), please provide all agreements from NM collaborators, including all parties whom NM needs in order to manufacture and sell the Omeprazole Products, that allows Distributor without any royalty, cost or other restriction imposed by the collaborators to sell the Omeprazole Products.  Not only should the collaborators' representations and indemnifications be provided to the Distributor, but also must be acceptable to the Distributor.

9.   Please provide pursuant to paragraph 10(d) representations from the collaborators that the sale of the Omeprazole Product does not infringe any U.S. Patent.

10.   Please provide the insurance and certificates which cover Distributor concerning breach of warranty or indemnity pursuant to paragraphs 9, 10(d) and 11 as set forth in paragraph 10(e).

11.   Please affirmatively state that NM has not granted any security interest in any IP assets of NM necessary to manufacture the Omeprazole Products pursuant to paragraph 10(f).

12.   As Distributor is not aware of any Omeprazole Products which NM can currently or in the future supply, NM should indemnify Distributor for its gross negligent and/or wrongful acts or omission by manufacturer which caused the unavailability of the Omeprazole Products.

13.   Please specifically state that there has been no "change of control" pursuant to paragraph 13(v).

14.   Please specifically state that NM has not assigned, subcontracted, delegated or otherwise transferred this Agreement or any of its rights or obligations pursuant to paragraph 15(b).

We respectfully request that you provide answers to this letter within seven (7) days and that you immediately cure all breaches of your obligations as required under the Agreement.

Sincerely yours,

/S/

Kevin Speltz
President Vet Bridge Animal Health



# Dechra
### Pharmaceuticals PLC

Annual Report and Accounts
for the year ended 30 June 2018



**SUSTAINING GROWTH**

Company Number: 3369634

Case 5:18-cv-06147-BCW   Document 26-2   Filed 11/07/18   Page 48 of 49

**EXHIBIT K (Speltz Decl.)**

# Notes to the Consolidated Financial Statements

continued

## 7. Profit Before Taxation

The following items have been included in arriving at profit before taxation of continuing operations:

|  | 2018 £m | 2017 £m |
|---|---|---|
| Cost of inventories recognised as an expense | 140.4 | 147.7 |
| Impairment of inventories included in above figure | 2.0 | 0.9 |
| Depreciation of property, plant and equipment | | |
| — owned assets | 4.8 | 4.9 |
| Amortisation of intangible assets | 56.6 | 42.4 |
| Loss on disposal of property, plant and equipment | — | 0.2 |
| Loss on disposal of intangible assets | — | 0.3 |
| Impairment of intangible assets — underlying | 0.1 | — |
| (Release)/recognition of impairment of receivables | (0.1) | 0.4 |
| Operating lease rentals payable | 2.8 | 3.0 |
| Research and development expenditure as incurred | 18.3 | 15.0 |
| Auditors' remuneration | 1.4 | 0.7 |
| Analysis of total fees paid to the Auditors: | | |
| Audit of these financial statements | 0.4 | 0.2 |
| Audit of financial statements of subsidiaries pursuant to legislation | 0.5 | 0.4 |
| Other assurance services - transaction services | 0.5 | 0.1 |
| Total fees paid to Auditors | 1.4 | 0.7 |

Included within research and development expenditure is £0.25 million to secure the worldwide rights for an equine gastro intestinal formulation from NewMarket Pharmaceuticals LLC which we plan to develop to registration through our R&D team.

## 8. Employees

The average numbers of staff employed by the Group during the year, which includes Directors, were:

|  | 2018 Number | 2017 Number |
|---|---|---|
| Manufacturing | 480 | 486 |
| Distribution | 128 | 109 |
| Administration | 829 | 743 |
| Total | 1,437 | 1,338 |

The costs incurred in respect of these employees were:

|  | 2018 £m | 2017 £m |
|---|---|---|
| Wages and salaries | 72.0 | 60.9 |
| Social security costs | 9.2 | 8.0 |
| Other pension costs | 3.7 | 4.4 |
| Share-based payments charge (see note 28) | 3.3 | 2.8 |
| Total | 88.2 | 76.1 |

Related party transactions — the remuneration of key management was as follows:

|  | 2018 £m | 2017 £m |
|---|---|---|
| Short term employee benefits | 5.5 | 5.1 |
| Post-employment benefits | 0.3 | 0.2 |
| Share-based payments charge | 1.6 | 1.7 |
|  | 7.4 | 7.0 |

Key management comprises the Board and the Senior Executive Team.

Details of the remuneration, shareholdings, share options, pension contributions and payments for loss of office of the Executive Directors are included in the Directors' Remuneration Report on pages 83 to 98.

The Group operates a stakeholder personal pension scheme for certain employees and contributed between 4% and 14% of pensionable salaries. The Group also participates in state-run pension arrangements for certain employees in Dechra Veterinary Products SAS and Dechra Veterinary Products BV and operates defined benefit schemes in some countries. Total pension contributions amounted to £3.7 million (2017: £4.4 million). Contributions to defined benefit pension schemes included in the above figures total £0.7 million (2017: £0.7 million).

Case 5:18-cv-06147-BCW   Document 26-2   Filed 11/07/18   Page 49 of 49